[No. 3,297.]

## WILLIAM VAN VACTOR *v.* JOSEPH WALKUP.

LIBEL COUCHED IN AMBIGUOUS LANGUAGE. — In an action for a libel, it is the province of the Court to determine whether the language of the alleged libel will bear a double meaning, one of which is libelous ; and when the Court has determined that it will bear such double meaning, it is the province of the jury to determine in which sense it was used.

CONSTRUING LIBEL COUCHED IN AMBIGUOUS LANGUAGE. — In determining whether the language of the alleged libel will bear a double meaning, one of which is libelous, the Court must not separate it into parts, and construe each part separately, but must construe each part of the alleged libel in connection with all the rest.

APPEAL from the District Court, Fourteenth Judicial District, County of Placer.

The complaint averred that the plaintiff, and W. H. Kinder, and J. D. Pratt were Supervisors of Placer County ; and that on the 4th day of April, 1870, said county was the owner of a large amount of the capital stock of the Central Pacific Railroad Company of California ; and that on said day the Legislature passed an Act authorizing said Supervisors to sell said stock, on such terms as they should deem

expedient; and that on the 13th of April, 1870, the Supervisors sold the stock to D. O. Mills & Co., a banking firm of Sacramento; that on the 10th day of December, 1870, the defendant published in his paper (the *Placer Herald*) of, and concerning the plaintiff, as a Supervisor, these false and defamatory words:

"The Act, under which the Supervisors sold our railroad stock, passed at the last session of the Legislature, gave the Supervisors power to sell said stock upon such terms and conditions as shall be deemed expedient by said Board, thus taking away from any other officers of the county all voice in the matter, or even to touch or keep an account of the proceeds. Under this extraordinary power the Board did sell, and after they had had the two hundred and fifty thousand dollars counted out to them, they then made such terms and conditions that the money never reached the County Treasury. These terms were, that D. O. Mills & Co. should keep the two hundred and fifty thousand dollars four months, and with it buy up our bonds at a discount, and then pay over the bonds to the Supervisors as so much gold coin at par. Instead of the money being in the Treasury here, it never was inside of Placer County, for the Supervisors swapped it off in Sacramento, and a villainous swap it was. Two things appear plain; one is, 'Who struck Billy Patterson?' and the other is, 'Who whipped the devil around the stump,' and thereby made money?"

The complaint alleged that the defendant meant, in said article, to charge him with having, in the performance of his duties as Supervisor, corruptly made money and acquired illicit gains in the sale of the stock, and with having been bribed by D. O. Mills & Co.

In the answer, the defendant denied that he meant to charge the plaintiff, as alleged, or that the article would bear the construction given to it by the plaintiff.

The Court charged the jury as follows :

"It is not pretended that the article complained of charges the plaintiff in express terms with corruption in office, or with dishonesty in his official or private conduct, but it is averred that the defendant intended to so charge, and that it was understood by those who read it as so charging. Now this is the meaning assigned to the article by the plaintiff in his complaint, and it is for you to determine whether that is the true meaning of the alleged libelous article.

"In order to determine this question you will read and consider the article itself, and also consider and weigh the evidence offered, for the purpose of illustrating the true and real meaning of the alleged libelous article. You are to read and understand the alleged libelous article according to the ordinary import of the language used.

"The article complained of commences by undertaking to give a brief history of the sale of Placer County's railroad stock to D. O. Mills & Co. It states that the Supervisors, the plaintiff being one of them, after selling the stock to D. O. Mills & Co., and after having the money counted out to them, swapped it off for the bonds of Placer County ; that swap or exchange is characterized as 'villainous.'

"So far, then, there is no dispute as to whom the article referred. It no doubt states and means that the plaintiff and his associates (Supervisors) did exchange the purchase money for the county bonds ; and if the article ended here, I apprehend that the plaintiff could not maintain this action. Reading it so far, and placing upon it that construction which the language would ordinarily impart, and understanding it according to the usual acceptation of the words employed, I would say that the article is not capable of bearing that construction placed upon it by the plaintiff—that is to say, it cannot be understood as charging the plaintiff with doing anything dishonest, or with corrupt motives. It amounts,

in my judgment, to nothing more than a statement that the exchange of the money for the bonds was unwise, improvident, and disadvantageous to the County of Placer. It is true the transaction is called 'a villainous swap,' but I suppose no one reading the article down to and including those words could or would be justified in believing that it was intended to charge the plaintiff with corruption in office. The word 'villainous" evidently was used to express the degree of improvidence or injudiciousness of the exchange, and not the motives or inducements that led to it.

" If the article, then, as I before stated, stopped here, this case would be free from difficulty; but it proceeds and closes with this sentence : ' Two things appear plain : one is, Who struck Billy Patterson ? and the other is, Who whipped the devil around the stump and thereby made money ?'

" By reference to the article itself it is clear that by Billy Patterson is not meant the plaintiff, but the author of a communication that appeared in the paper of the previous week; but to whom the words ' who whipped the devil around the stump and thereby made money,' referred is not clear. The plaintiff avers in his complaint that by this language the defendant meant to charge him with corruption in office, with making illicit gain in the transaction referred to, and with being bribed by D. O. Mills & Co. to cheat and defraud the County of Placer, etc. This is denied by the defendant, who says that it refers to the County Auditor, who had charged his percentage on money that never was in the County Treasury, and with which he had never dealt and could not deal.

"Your verdict then will depend upon the solution of the single question, what is the true meaning and construction of the article complained of ?

" From the article itself it appears that it was written in reply to one published in the *Stars and Stripes* of the week

previous, in answer to a communication published in ·defendant's paper on December third.

"The article complained of, then, seems to be but a continuation of a discussion commenced in the *Herald* of December third.

" In order to ascertain the true meaning and intent of the alleged libelous article, you will take into consideration the other two articles to which I have referred ; and this I say to you because it is usual that discussions in relation to matters of public interest are carried on in the public newspapers ; and as there can be no libel unless the libelous matter is made public, and as in this case it is said to have been made public by the general circulation of the newspaper containing it, it must be presumed that those who read it must have read it in connection with the other articles, of which this was a continuation ; and as you are to place yourselves in the position of those who read it, you must read it with the same light, and then by your verdict say what construction the readers of this paper put upon the article claimed by the plaintiff to be libelous : and if, after this, you should believe that the article contains a charge of corruption in office against the plaintiff, and was so understood by those who read it, you will find for the plaintiff.

" But if, on the contrary, you should believe that article, taken in connection with the preceding ones, does not so charge the plaintiff, and cannot be understood as charging him with dishonesty or corruption in office, you will find for defendant.

" It is my duty to inform you that you are the sole judges of the facts ; it is not my province to charge you as to them ; and I have therefore endeavored to avoid any intimation upon them.  If you should find for the plaintiff, you will assess the damages at such sum as you may think reasonable and proper."

The other facts are stated in the opinion.

*Catlin & McFarland*, for Appellant.

The authorities are all to the point that when the language is ambiguous, and capable of the meaning charged in the complaint, then the determination of its meaning, as used by the defendant, must go to the jury. In *Dexter* v. *Taber*, 12 Johns. 239, the Court say: "And in what sense the words were intended to be used was for the jury to determine. This point is well settled, both in our own and in the English Courts."

If the words were of doubtful signification, it was the province of the jury to determine in what sense they were used. (*Goodrich* v. *Woolcot*, 3 Cowen, 240.) If the letter had been equivocal in its terms, it would have been the duty of the Judge to submit the construction of it to the jury. (*Snyder* v. *Andrews*, 6 Barb. 47; *Ways* v. *Brierly*, 4 Watts, 392.) It is for the Judge to decide whether the language is capable of the meaning ascribed to it by the innuendo, and for the jury to decide whether such meaning is truly ascribed. (Townsend on Libel, Sec. 284, and cases there cited.) There is no case contrary to this proposition.

Now, that the words "a villainous swap it was," as used in the alleged libel in the case at bar, are "capable of the meaning" ascribed to them in the complaint, is too palpable for argument. It is almost impossible to ascribe any other meaning to them. And yet the Court told the jury they only meant—that is, necessarily only meant—an "unwise, improvident, and disadvantageous" trade.

But when the Court undertook to construe the alleged libelous article at all, it should have construed the whole of it. To take the greater part of the article away from the jury, and leave them to manage the mutilated remains, was

the worst and most erroneous course possible to take in the premises. The complaint does not charge that any particular, isolated part of the article is libelous, but that the idea conveyed by the article as a whole—the impression made by it, as an entirety, on the minds of the readers—was such as the complaint alleges. To divide an alleged libel into parts—and, carrying the dissecting process further, to separate it into sentences, lines, words, and syllables—and examine each detached part by itself, would draw the sting from the most defamatory matter ever published. (*Graves* v. *Waller*, 19 Conn. 93.)

*C. A. Tuttle*, and *Fellows & Norton*, for Respondent.

The plaintiff complains that the Court erred in charging that the article, down to the last four lines, was not libelous. The Court tells the jury that the language thus far is not capable of bearing the meaning assigned to it by plaintiff, but that when it is all read, it is ambiguous, and might bear such meaning; and that it is for the jury to find what its true meaning is. The Court does not divide the article as alleged, nor take away from the jury the right of finding whether it bears the libelous meaning assigned to it. So far as the language is unambiguous, the Court tells the jury what meaning it will bear, but leaves the whole article to the jury.

Townsend on Libel (Sec. 342): "It is for the Judge to decide whether the language is capable of the meaning ascribed to it by the innuendo, and for the jury to decide whether such meaning is truly ascribed." (*Cooper* v. *Greeley*, 1 Denio, 361; *Vanderlip* v. *Roe*, 23 Penn. St. R. 82; *Barger* v. *Barger*, 18 Penn. St. R. 489; *Justice* v. *Kirlin*, 17 Ind. 588.)

This is all the Judge has done in this case. He has merely told the jury what meaning is capable of being ascribed to the language. He then leaves the whole question to the jury.

Townsend (Sec. 284): "It is the exclusive province of the Court to determine the construction of the language published, and to determine whether or not upon its face it is actionable *per se*."

By the COURT :

The plaintiff was one of the Supervisors of Placer County, and the defendant the publisher of a newspaper in the same county. The action is for libel, and was tried before a jury, which rendered a verdict for the defendant; and the plaintiff, having moved for a new trial, which was denied, has appealed from the judgment and from the order denying his motion. The alleged libel related to a sale by the plaintiff and two other Supervisors of said county, under the authority of a special Act of the Legislature, of certain shares of the capital stock of the Central Pacific Railroad Company, which belonged to the county. It was published in the defendant's paper, and stated that the Act of the Legislature gave to the Supervisors power to sell the stock upon such terms and conditions as they should deem expedient; that under this authority they sold the stock; "and after they had had the two hundred and fifty thousand dollars counted out to them, they then made such terms and conditions that the money never reached the County Treasury. These terms were, that D. O. Mills & Co. should keep the two hundred and fifty thousand dollars four months, and with it buy up our bonds at a discount, and then pay over the bonds to the Supervisors, as so much gold coin at par. Instead of the money being in the treasury here, it never was inside of Placer County, for the Supervisors swapped it off in Sacramento, and a villainous swap it was. Two things appear plain : one is, who struck Billy Patterson? and the other is, who whipped the devil around the stump, and thereby made money?" The statement on

the motion for new trial contains none of the evidence, and only the charge of the Court to the jury, which was excepted to by the plaintiff. Whether the charge was correct or otherwise, is the only question raised by the plaintiff on the appeal.

After correctly defining a libel and stating the pleadings, the Court instructed the jury that they are to decide whether the article is libelous, and if it be, whether it refers to the plaintiff—" that is to say, does it charge the plaintiff with corruption in office?" * * * "It is not pretended that the article complained of charges the plaintiff in express terms with corruption in office, or with dishonesty in his official or private conduct; but it is averred that the defendant intended to so charge, and that it was understood by those who read it as so charging. Now, this is the meaning assigned to the article by the plaintiff in his complaint, and it is for you to determine whether that is the true meaning of the alleged libelous article. In order to determine this question, you will read and consider the article *itself*, and also consider and *weigh* the evidence offered, for the purpose of illustrating the true and real meaning of the alleged libelous article. You are to read and understand the alleged libelous article according to the ordinary import of the language used." If the charge had stopped here, it would have announced the law precisely as the plaintiff claims it to be. This portion of the charge is certainly not amenable to the criticism addressed to the remainder of it by the plaintiff's counsel. It submits the *whole* publication to the consideration of the jury, in order that they may determine whether the language employed was used in a libelous sense. But the Court proceeds to recite the substance of the publication, and instructs the jury that all that portion of it from the commencement down to and including the words " and a villainous swap it was," "cannot be *understood* as charging the plaintiff with doing anything dishonest or

with corrupt motives ;" that it amounts only to a statement "that the exchange of the money for the bonds was unwise, improvident, and disadvantageous to the County of Placer. It is true, the transaction is called 'a villainous swap,' but I suppose no one reading the article down to and including those words could or would be justified in believing that it was intended to charge the plaintiff with corruption in office. The word 'villainous' evidently was used to express the degree of improvidence or injudiciousness of the exchange, and not the motives or inducements that led to it." It is this portion of the charge to which the plaintiff particularly excepts; and he insists that the phrase, "and a villainous swap it was," in the connection in which it was used, is capable of being interpreted, in its ordinary and popular sense, as imputing to the plaintiff dishonest conduct and motives, and that it was for the jury, and not the Court, to determine in what sense it was used and understood. When the language is ambiguous, that is to say, when it is capable of two meanings, one of which is harmless and the other libelous, it is undoubtedly the province of the jury to determine in which sense it was used. But it is equally clear that it is the province of the Court to determine whether, on its face, the alleged libel is capable of a double meaning. "It is for the Judge to decide whether the language is capable of the meaning ascribed to it by the innuendo, and for the jury to decide whether such meaning is truly ascribed to it." (Townsend on Libel, Sec. 284, and cases there cited.) The Court, therefore, did not exceed its authority in determining the question whether the phrase, "and a villainous swap it was," is capable of the meaning ascribed to it by the plaintiff. But whether it correctly decided the question is open to review on this appeal. In ascertaining the meaning of a particular sentence, it must, of course, be construed in connection with the remainder of the publication of which it forms a part. An isolated phrase, if standing alone, or

used in a different connection, may be capable of a meaning of which it is not susceptible in the connection in which it is used. The familiar illustration of this proposition, as given in the books, is that to say of a man that "he is a thief," is, of course, actionable, as importing a charge of crime; but if it be added, "because he stole a lady's heart," it becomes apparent that the words were used in a harmless sense, and are not capable of a different interpretation.

In determining whether the language is capable of a double meaning, one of which may be libelous, it must, therefore, be construed in connection with the remainder of the publication; and the Court below fell into the error of separating the alleged libel into two parts, and construing each part separately, without reference to the other. If the phrase, "and a villainous swap it was," in connection with what preceded it, is not capable of being understood as imputing to the plaintiff dishonesty in his private or official capacity, this certainly cannot be affirmed of it when considered in connection with what immediately follows, viz.: "Two things appear plain. One is, who struck Billy Patterson? and the other is, who whipped the devil around the stump, and thereby made money?" It may be that all these phrases were used in a harmless sense, but it cannot be said that they are incapable of being understood in any other; and it was for the jury, and not for the Court, to decide in what sense they were used.

Judgment reversed, and cause remanded for a new trial.