[Civ. No. 2080.    Third Appellate District.—February 12, 1920.]

## NATHAN NEWBY, Respondent, v. TIMES-MIRROR COMPANY (a Corporation), Appellant.

[1] APPEAL—LAW OF CASE ON SECOND APPEAL.—Where the pleadings, issues, and facts presented on a second trial are essentially the same as those developed at the first trial, the rules and principles enunciated and applied by the appellate court on the appeal from the judgment rendered at the first trial constitute the law of the case on the appeal from the judgment rendered at the second trial.

[2] LIBEL—ALTERATION OF PUBLIC RECORDS—ALLEGATIONS NOT CONSTITUTING DEFENSE PROPERLY STRICKEN FROM ANSWER.—In an action for damages for libel, consisting of the publication of a cartoon and of several articles, alleged to have been intended to convey the meaning that plaintiff had changed public records and was in the habit of changing public records, that plaintiff in his political activities was not sincere, but was a hypocrite, and that while posing as a reformer, he was in fact guilty of changing public records and a criminal, it is not error to strike from the answer allegations introduced therein as a special defense, where such allegations, though true, do not establish a defense to other libelous publications concerning plaintiff.

[3] ID.—MATTERS STRICKEN FROM ANSWER—ADMISSION OF EVIDENCE—HARMLESS ERROR.—Error of the trial court in striking from an answer matters proper to be pleaded and proved is not reversible where the defendant is allowed to prove such allegations, and thus get them before the jury.

[4] ID.—IRRELEVANT NEWS ARTICLE PROPERLY EXCLUDED.—On the trial of an action for damages for libel, consisting of the publication of a cartoon and of several articles, the evident purpose of which was to degrade and belittle the plaintiff and his associates in the estimation of the public and thus interpose an effectual handicap to the avowed purposes of the local political organization of which they were the prime promoters, it is not error to refuse to allow in evidence an earlier article published by defendant which had no connection with the cartoon and other publications complained of.

[5] ID.—MITIGATION OF DAMAGES—OTHER PUBLICATIONS NOT ADMISSIBLE WHEN MEANING CLEAR.—Where the meaning of such cartoon and articles was so clear that no one reading the articles and inspecting the cartoon with its accompanying words could but conclude that, if said articles and cartoon spoke the truth, then the plaintiff was a hypocrite and a criminal, such earlier article was not admissible on the theory that it would tend to show, in

mitigation of damages, that the publications complained of bore a restricted meaning and that it was in the sense of such meaning that all or a large portion of defendant's readers understood to attach to the publications thereof.

[6] ID.—WHEN EVIDENCE ALIUNDE ADMISSIBLE.—In such an action, evidence *aliunde* the publication sued on is admissible, in mitigation of damages, only where it is manifest that such evidence can and will show or tend to show that the defendant, in making the publication complained of, acted in good faith and with honesty of purpose, and not maliciously. The defendant may show, if he can, that the remainder of the libel not set out in the pleadings modifies the words sued on, or other passages in the same publication qualify them; but he may not put in passages contained in a subsequent and distinct publication, unless the words sued on are equivocal or ambiguous.

[7] ID.—TEST OF ADMISSIBILITY OF EVIDENCE ALIUNDE.—The test of the admissibility or nonadmissibility of publications other than those complained of is whether such articles will or will not tend to show facts which should properly be considered in mitigation of damages, or tend to show an absence of actual malice in the publication complained of.

[8] ID.—EVIDENCE ALIUNDE ADMISSIBLE TO SHOW MEANING OR SENSE OF PUBLICATION.—Where the meaning or sense of the publication pleaded and so complained of by the plaintiff cannot be apprehended or understood without reference to some other publication upon the same subject, and having reference to the plaintiff, it is competent and proper to receive the latter publication in evidence.

[9] ID.—PURPOSE OF ARTICLES PUBLISHED — CROSS-EXAMINATION OF PRESIDENT AND GENERAL MANAGER AS TO FEELINGS PROPER.—In an action for damages for libel consisting of the publication of a cartoon and of several articles, the purpose of which was to destroy the force of a political organization of which plaintiff and his associates were the leading promoters, the court may properly allow the president and general manager of the defendant newspaper to be cross-examined by plaintiff's counsel as to whether he entertained ill-feeling against the several persons caricatured and included in the cartoon other than the plaintiff.

[10] ID.—PUBLICATIONS LIBELOUS PER SE — PRESUMPTION OF MALICE NOT REBUTTABLE.—The presumption of malice from the publication of a defamatory article in and of itself libelous or actionable *per se* cannot be rebutted.

[11] ID.—ACTUAL DAMAGE—ELEMENTS CONSIDERED.—Among the elements of actual damage which may be considered and made in part the bases of the actual detriment suffered by the plaintiff

from the libelous publications is not only the loss of reputation, but also the shame, the mortification, and injury to feelings, etc.

[12] ID.—HOW DAMAGES MEASURED — WHEN VERDICT MAY BE DISTURBED.—There is no scale or definite standard by which wrongs arising from defamatory publications can be accurately measured and determined, but they must be judged and appreciated by the view taken of them as they are made to appear by the circumstances of each particular case by fair-minded and impartial men; and unless it clearly appears that the amount of damages allowed by the jury could only have been arrived at through passion or prejudice, it does not rest with the courts to set the verdict aside.

[13] ID.—ABSENCE OF MALICE ON PART OF REPORTER NOT ADMISSIBLE EVIDENCE.—In such an action, it is not error to disallow a reporter for the defendant newspaper to state whether he had any malice against the plaintiff at the time he wrote a certain article therein, there being no showing that he authorized or was responsible for the publications complained of, or had any authority to control the policy of the defendant, or direct what publications should or should not be made by the defendant.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Affirmed.

The facts are stated in the opinion of the court.

Hunsaker, Britt & Edwards and Samuel Poorman, Jr., for Appellant.

Edwin A. Meserve and W. F. Palmer for Respondent.

HART, J.—The action is for damages for libel. Plaintiff had judgment, following the verdict of a jury, for seven thousand five hundred dollars, and defendant appeals from the judgment.

On a former trial of the action, judgment was in favor of defendant, which judgment was reversed by the supreme court. (*Newby* v. *Times-Mirror Co.*, 173 Cal. 387, [Ann. Cas. 1917E, 186, 160 Pac. 233].) From that decision we quote the following statement of the facts:

12. Elements of damages in actions for libel and slander, note, 72 **Am. Dec.** 421.

Excessiveness of verdict in action for libel, notes, **Ann. Cas.** 1913B, 700; **Ann. Cas.** 1916D, 1175.

"The defendant is the publisher of the 'Los Angeles Times,' a daily newspaper of large and general circulation, published in the city of Los Angeles. The alleged libels consist of articles published in that newspaper.

"Nathan Newby, at the time of the publications, in September, October, and November, 1909, had been practicing law in Los Angeles for the preceding fourteen years. He was a man of good character and reputation, and was a well-known lawyer in active practice and in good standing, being one of a firm of lawyers practicing as Valentine & Newby. Prior to July, 1909, one Blumer had obtained a judgment by default in the superior court of Los Angeles County, against Felix Mayhew for the recovery of $8,750. An execution had been duly issued thereon to the sheriff of Los Angeles County. A motion by Mayhew to set aside the judgment was pending. Valentine & Newby were attorneys for the plaintiff in the judgment, and Percy R. Wilson was the attorney for Mayhew. On or about July 23, 1909, the parties agreed on a settlement whereby the plaintiff was to accept five thousand dollars in money in full satisfaction of the judgment. Mayhew procured a check on the National Bank of California for five thousand dollars, payable to himself and duly certified by the cashier for that sum, and Newby, for the plaintiff, agreed to accept this check, properly indorsed, in lieu of the money, upon the settlement. Pursuant to this agreement, and by arrangement, on the following day, July 24, 1909, Newby, Mayhew, Wilson, and McCabe, a lawyer, also acting for Mayhew, went together to the office of the county clerk, in order that Mayhew might there deliver the check to Newby, and Newby there enter satisfaction of the judgment and thereupon deliver to Wilson an order to the sheriff to release any property held by him under the execution. In the meantime the check had been duly indorsed by Mayhew to Valentine & Newby, and Mayhew, in collusion with McCabe, but without Wilson's knowledge, had surreptitiously prepared, ready for filing, a complaint in his own name against Blumer, the National Bank of California, Newby, and others, to enjoin payment of the check about to be delivered, together with a restraining order to the same effect ready for the signature of the judge on presentation. None of the other parties had any knowledge of the preparation or ex-

istence of these papers or of the design to enjoin the payment of the check after its delivery.

"At the clerk's office, which was in the courthouse, Ross, the judgment-book clerk, produced the judgment-book and with a rubber stamp impressed on the margin of the entry of the judgment of *Blumer* v. *Mayhew* an entry of satisfaction thereof. Mayhew then delivered the five thousand dollar check to Newby who thereupon signed the firm name, 'Valentine & Newby, Attorneys for Plaintiff,' to the entry of satisfaction, handed to Wilson the order to the sheriff for the release of property levied on, and passed to the deputy clerk one dollar to pay the fee of twenty-five cents for the entry. The deputy then went back to the cash drawer for change and Newby stood awaiting it. McCabe and Mayhew, saying that they supposed they were through, hurriedly left the room. Wilson also left the room with the order of release for the sheriff. While the deputy was getting the change and Newby was waiting for it, Mayhew and McCabe proceeded to the chambers of a judge of the superior court, presented to him the complaint and order for the injunction against payment of the check just delivered, and the judge signed the order and delivered it to them. All this occupied but two or three minutes. While Newby was still awaiting change, the injunction aforesaid, together with a summons in the injunction suit, which had been begun by the filing of the papers in that short space of time, were served upon him by some person other than McCabe or Mayhew.

"Quickly examining the papers served upon him, Newby perceived the gross fraud attempted, and at once called out to the clerk that he had been 'flim-flammed,' in the satisfaction of judgment and that he desired immediately to mark it out, showing the deputy the said injunction order. The deputy thereupon turned to the entry of satisfaction, took a pen and drew several canceling lines across it and wrote beneath it the words: 'Marked out at my request.' Newby then signed the name 'Valentine & Newby' under said words. He then left the room, intercepted Wilson before he had delivered the release to the sheriff and told him of the injunction. Wilson expressed his indignation and he and Newby then went together to the bank. There they found a person serving the injunction papers on the

officers of the bank. Newby presented the check, the bank declined to pay it, and it never has been paid.

"All this occurred on Saturday. On the following Monday, Wilson withdrew his name as attorney for Mayhew in the case of *Blumer* v. *Mayhew*, and Newby procured from the judge an order denying Mayhew's motion to vacate the judgment. Newby afterward began proceedings by motion for a formal order by the court setting aside the said entry of satisfaction. This motion came on for hearing on September 21, 1909. At that time an attorney in the interest of Mayhew called the matter to the attention of the defendant's city editor, who immediately detailed a reporter of that paper to get the facts and write up the 'story.' He proceeded to do so, and the article set forth in the first count of the complaint published in the 'Times' on September 22, 1909, was the result. It states the facts substantially as above related, but added that Newby was accused of a felony in altering a public record, that the district attorney was considering the facts, and that Mayhew was willing to swear to a complaint charging Newby with such offense."

Before the retrial of the case, plaintiff filed an amended complaint and omitted therefrom the article of September 22, 1909, above referred to.

In the first count of the amended complaint it is alleged: "That the said defendant wickedly and maliciously, and with the intention and design to injure, disgrace, and defame this plaintiff, and to bring him into public discredit and obloquy, printed and published in said newspaper on the fourth day of October, 1909, of and concerning this plaintiff, a certain cartoon, picture, or effigy which represented the plaintiff, with a pen or pencil in his right hand, with a book representing a public record, and marked on the back thereof 'Public Records,' and representing the plaintiff as saying, 'I'll change 'em'; that said cartoon also contained caricatures of other citizens of Los Angeles, most of them prominent in the good government organization which had for its object the bettering of municipal conditions in the city of Los Angeles; that said cartoon, at the top thereof, had these words printed: 'And these are our leading reformers,' and at the bottom of said cartoon had the following quotation: 'All hypocrites are

sinners, but, thank God, all sinners are not hypocrites.' "
A photographic copy of said cartoon followed the above
allegation. It is then alleged: "That by the foregoing false,
malicious, and defamatory picture and publication, the
defendant intended to convey the meaning, and the said
picture was by the persons who observed the same as pub-
lished in said paper, understood and believed to convey the
meaning that the said plaintiff had changed public records
and was in the habit of changing public records; that
the plaintiff, in his political activities, was not sincere,
but was a hypocrite; and that while posing as a reformer,
plaintiff was, in fact, guilty of changing public records,
and a criminal."

The second, third, fourth, and fifth counts of the amended
complaint quote articles from issues of the "Times"
on, respectively, October 5, October 29, November 16,
and November 25, 1909, and repeat the allegation of
the first count, above set out, as to the malicious
intent with which each publication was made; and in each
of said counts the meaning intended and understood is
alleged practically as in the first count. The following
excerpts will show the general character of the articles: "If
it were not for court records and newspaper files and the
like of that, there are some Los Angeles 'reformers' who
would exude *eau de cologne* instead of the familiar stench
that now accompanies them on their devious peregrina-
tions." "There is a movement to stop gambling of all
kinds in Los Angeles, through an initiative petition proposing
an anti-gambling ordinance submitted by the arch-reformer
Nathan Newby. Beginning with a desire to stop humble
citizens from shaking dice for cigars, which Newby and
others volubly and defiantly expressed to the council before
it was found Newby had been tampering with the county
records," etc. "Then Nathan Newby's anti-gambling in-
itiative ordinance will have place in the question-box. It
aims to prevent smokers from joining in a friendly game
of dice with the cigar-store clerk with the cigars at stake.
This so shocked Nathan that he forgot to alter any more
public records." "A motion was made after the rendition
of the judgment [in *Blumer* v. *Mayhew*] to set it aside, but
about that time Nathan Newby, of the legal firm of Valen-
tine & Newby, caused the judgment on the records in the

office of the county clerk to be mutilated and the satisfaction of the judgment wiped out.''

As to the contents of the amended answer; we adopt the following statements from appellant's opening brief: ''The defendant denied the libelous character of the publications, and as to some pleaded the truth of the facts stated in justification, and as to others, pleaded that they were privileged as being fair, full, and impartial reports of public and judicial proceedings, or fair comment and criticism upon matters of public interest.

''The defendant, as separate and further defenses to each count of the complaint, and in mitigation of damages, pleaded all the facts surrounding the alteration of the public record by plaintiff on the twenty-fourth day of July, 1909, and the further fact that the defendant, after having made a fair and reasonable investigation of the facts did, on the twenty-second day of September, 1909, without malice or ill will toward plaintiff, print the article of September 22, 1909 [setting the same forth in full], which article was alleged to have been a full, true, and correct account of the entire transaction; that the cartoon and subsequent articles appearing in the defendant's paper all referred to the acts and occurrences as set forth in full in the publication of September 22d, and that it was not the intention of the defendant in any of its subsequent publications to charge the plaintiff with the commission of any acts other than those set forth fully in the article of September 22d, and that the readers of defendant's paper so understood the cartoon and subsequent articles, and did not attribute to them any meaning or significance other than as set forth so completely, fairly, and fully in the article of September 22d.''

It is then stated in appellant's brief: ''To such special and separate defenses plaintiff demurred, which demurrer was overruled. Notwithstanding this, at the commencement of the trial, on plaintiff's motion and against defendant's objections, the said several separate defenses in mitigation of damages were stricken out by the court.

''During the trial the defendant endeavored, but was not permitted, to introduce in evidence the article of September 22, 1909, for the purpose of showing a lack of malice, and for the further purpose of explaining the subsequent articles

and cartoon, as well as the understanding of the readers who saw and read the subsequent articles.''

The first contention of appellant is that the court erred in striking from the answer said allegations and in refusing to admit evidence in support thereof.

[1] The pleadings and the issues presented and the facts of this case are essentially the same as those developed at the first trial hereof, except such evidence as might have been directly addressed to the first publication of the transaction whereby the plaintiff caused the record in the case of *Blumer* v. *Mayhew* to be changed, so far as was concerned the notation or entry satisfying the judgment therein. It follows that the rules and principles enunciated and applied in the decision of the case as presented on the former appeal bear directly upon the case as made at the second trial, of which the present appeal is the outgrowth, and that the decision on the previous appeal is, therefore, the law of the case. It is consequently conceived that it will clarify the discussion of the points presented by the present record and to be the orderly course before taking up for consideration the several contentions upon which the appellant relies for a reversal, to reproduce here the following extended excerpts from the opinion by Mr. Justice Shaw of the supreme court, filed in deciding the former appeal (see 173 Cal. 388, 392, [Ann. Cas. 1917E, 186, 160 Pac. 233, 235]) :

''It would, perhaps, puzzle a person not familiar with the Penal Code to discover in the conduct of Mr. Newby, as detailed above, anything immoral or reprehensible, or other than a commendable zeal to protect his client against palpable fraud. But sections 113 and 114 of the Penal Code declare that it is a felony for any person to deface or alter a record or any part thereof kept officially in any public office. The marking out of the entry of satisfaction by drawing lines across it with a pen was done by the deputy clerk at the request of Newby, who is, consequently, equally responsible therefor with said deputy. It was a defacement of a public record. It is clear from the facts stated that Newby was actuated solely by the praiseworthy purpose of frustrating the fraudulent acts of Mayhew in procuring the entry of satisfaction to be made without consideration and that his intent was not in any wise criminal

in character. It was but an irregular method of effecting a righteous result. Nevertheless, so great is the care of the state that the public records shall remain unchanged, except when changed in an authorized manner, the statute is so drawn as to make even such laudable defacement a felony. The intent is immaterial. The act itself without intent other than that of doing it constitutes the offense, regardless of the object. This has been expressly decided in this state and is the general rule in respect to statutory offenses of that kind. (*People* v. *O'Brien,* 96 Cal. 175, [31 Pac. 45] ; *People* v. *Tomalty,* 14 Cal. App. 229, [111 Pac. 513].) Therefore, although the plaintiff was guilty of no moral wrong or bad intent in the matter, it is technically true that he was accused of the commission of a felony. The answer alleges as a defense to the first count that the several matters complained of therein as libels upon the plaintiff were and are true, setting forth the particular facts which it is claimed established the truth of that charge. In so far as the publications assert that the plaintiff was accused of the commission of a felony, confined as they all are to the act of crossing out the entry of satisfaction of the judgment in *Blumer* v. *Mayhew,* the defense of truth is established by the evidence, although the offense was entirely technical, was without moral guilt, and was intended to bring about justice.

"The truth of this part of the matter complained of, however, does not establish a defense to the other libelous publications concerning plaintiff. With reference to the cartoon or caricature of plaintiff and others with certain inscriptions upon it, published in the 'Times' of October 4, 1909, the defendant in its answer alleged it was made in the midst of a strenuous political campaign in which the plaintiff was identified with and prominent in the party opposed by the 'Times' newspaper, and known as the Good Government League, or reformers, that cartoons were frequently published by or in behalf of the respective parties in the conduct of the campaign, that in carrying on its part of the campaign the 'Times' published said cartoon as 'a merry and harmless pictorial allusion to the leaders of said reformers as a political class, and not as private individuals, and merely by way of facetious rejoinder to many political criticisms and censures' of the party supported by the

'Times,' made by said reformers in public speeches and newspapers. These facts could only be considered in mitigation of damages. They do not constitute a defense. The case does not come within the rule as to privileged communications, as laid down in subdivision 3 of section 47 of the Civil Code. In *Wilson* v. *Fitch*, 41 Cal. 382, the court said: 'Nor can a defamatory publication in a public journal be said to be privileged simply because it relates to a subject of public interest, and was published in good faith, without malice, and from laudable motives.' (*Edwards* v. *San Jose etc. Soc.*, 99 Cal. 438, [37 Am. St. Rep. 70, 34 Pac. 128] ; *Gilman* v. *McClatchy*, 111 Cal. 606, 614, [44 Pac. 241].) The duty of a newspaper to the public does not· justify the publication of false and defamatory matter concerning a private citizen merely because he is active in promoting his own political views. A publication concerning such person, if libelous in its nature, cannot be excused on the ground that the occasion is privileged, and can be justified only by pleading and proving that it is true. And the fact that the matter published tends to cause merriment, or is a 'facetious rejoinder' to adverse criticisms made by other persons, does not justify the wrong. It is libelous *per se* to falsely charge that a person is a hypocrite.

"The answer does not allege that the imputation of hypocrisy to Newby, or the imputation that he was in the habit of altering public records, alleged to be the purport of said cartoon, were true, but denied that it was susceptible of that meaning. The court below, at the request of the plaintiff, instructed the jury that it should determine whether or not said cartoon would fairly represent to the ordinary reader that the plaintiff was a hypocrite and was in the habit of changing public records, and that if it was found to have that meaning the plaintiff would be entitled to recover on the second count, unless it was proved to be true that plaintiff was a hypocrite and was in the habit of changing public records. The verdict in favor of the defendant necessarily implies that the jury either found that the cartoon was not susceptible of the meaning imputed to it, or found that plaintiff was a hypocrite and was in the habit of changing public records. The plaintiff insists that the evidence does not support

either of these findings, and this insufficiency is assigned as cause for a new trial.

"The instruction that the jury might find for the defendant if the imputation to Newby of hypocrisy and the habit of altering public records were proven was not properly within the issues, inasmuch as the answer does not aver the truth of these charges. As the plaintiff requested the instruction, he cannot complain that it was given, but he may make the point that the implied findings are not supported by the evidence.

"There was no evidence whatever to the effect that Newby was a hypocrite, or that he was in the habit of altering public records. The act of altering the entry in the case of *Blumer* v. *Mayhew,* when considered in the light of circumstances under which it was done, does not tend to show hypocrisy, or any sort of depravity in the character of Newby. It only shows that he was in error as to the lawful method of correcting the wrong attempted by Mayhew. Any finding that the charge of hypocrisy was true would be contrary to the evidence. It is, therefore, to be presumed that the jury did not find that charge to be true. The verdict can only be supported, so far as this count is concerned, on the theory that the jury concluded that the cartoon would not, to an ordinary reader, bear the meaning that the defendant was a hypocrite or was in the habit of changing public records.

"The evidence does not justify such conclusion. The heading to the cartoon, consisting of the phrase, 'And these are our leading "reformers," in itself implied that the persons pictured were not worthy to be called reformers and were claiming a virtue they did not possess.' The statement below: 'All hypocrites are sinners, but, thank God, all sinners are not hypocrites,' taken in connection with the admitted fact that these persons were generally known as 'reformers' in the pending political campaign, was nothing less than an indirect assertion that the persons whose pictures appeared above were both sinners and hypocrites, while their opponents might be sinners, but were not hypocrites. This meaning was also indicated by the fact that the four persons, other than Newby, shown in the cartoon, were each portrayed as engaged in transactions either disreputable, dishonest or ridiculous and, further, by the sinister

expression on the face of Newby as given in the cartoon. All these circumstances may be considered. (*Bettner* v. *Holt,* 70 Cal. 274, [11 Pac. 713].) Newby was not named in the cartoon, but it is practically conceded that the picture was sufficiently like him to be readily recognized by all who knew him. No person of ordinary intelligence could fail to perceive that the cartoon was intended to suggest that the plaintiff was a hypocrite posing as a reformer. The verdict on this point is, therefore, contrary to the evidence. The plaintiff was entitled to recover on this point, regardless of the weakness of his case on other counts.

"We do not mean to intimate that the other publications set forth in the complaint do not, in effect, assert that the plaintiff was addicted to the changing of public records and impute to him a moral obliquity or depravity which was not established by his conduct in the case of *Blumer* v. *Mayhew,* and which was no part of his character, or that they do not also impute to him hypocrisy and insincerity. These are, for the most part, questions of fact as to which, upon another trial, the result may be different. Our conclusion with regard to the second count makes it unnecessary to consider them further upon this appeal."

[2] It is only necessary to look to the foregoing language of the supreme court to find an answer to the contention that error was involved in the action of the court in striking from the answer the allegations thereof, introduced therein as a special defense, reciting the fact of the alteration of the record as described by the plaintiff and the facts and circumstances attending that transaction. It will be noted that the supreme court, in referring to the part of the answer setting forth those facts, said: "The truth of this part of the matter complained of, however, does not establish a defense to the other libelous publications concerning plaintiff." [3] But if the facts of that transaction were proper to be pleaded and proved as in mitigation of damages, then the reply is that said facts were not only pleaded in the answer and allowed to remain therein, not, however, as a "further and separate answer and defense," but the defendant was allowed to prove them. The affidavit of plaintiff, prepared and filed in a proceeding instituted in the superior court for the purpose of obtaining a decree setting aside the entry of satis-

faction of the judgment in *Blumer* v. *Mayhew,* and which fully and in detail recited the facts and circumstances characterizing the transaction eventuating in the changing of the record in said case, was introduced in evidence by the defendant as part of the testimony of the defendant's witness, Samuel G. Austin, who was the reporter of the defendant and as such interviewed plaintiff at the time the record was changed in regard thereto and prepared for the defendant the article first published by it concerning said transaction. Certain letters anent the judgment in *Blumer* v. *Mayhew* over the signature of the law firm of which the plaintiff was then a member were at the same time also introduced in evidence. Thus it is plain that the defendant got before the jury and so obtained whatever benefit there was in the facts and circumstances attending the transaction culminating in the changing or alteration of the record by the plaintiff.

[4] It is next contended that error prejudicing the rights of defendant was committed by the refusal of the court to allow in evidence, at the behest of the defendant, the first article published by the defendant (on September 22, 1909), concerning the fact of the alteration of the record. That article, as above shown, was pleaded in the original complaint as the basis for the first count thereof, and which the plaintiff therein declared was libelous as against him. As is also likewise shown, the complaint as amended upon the return of the cause by the supreme court for a retrial eliminated therefrom said article, so that it no longer remained as one of the causes of action relied on against the defendant. The article is in the record, it having been offered in evidence and marked for identification. The purpose which it is claimed the article would subserve as evidence for the defendant is stated above.

It was not error to exclude the article. Aside from the consideration that said article referred to the same transaction as that referred to by the publications declared upon by plaintiff, and was, indeed, the first appearing in the defendant's newspaper announcing and giving the details of the fact of the alteration of the record by the plaintiff, it had in a legal sense no necessary or, in truth, any connection with the cartoon and other publications concerning that transaction appearing subsequently in defendant's news-

paper and complained of here. It could not, therefore, be
of any service in explaining the reasons for the publication
of the cartoon and subsequent articles, or in any way tend
to show that the later articles and cartoon were published
without malice against the plaintiff. It is manifest that
the cartoon and the other publications counted on by the
plaintiff were published not as a mere matter of news rela-
tive to the plaintiff's act in altering the record in the case
mentioned. The news feature of that transaction had al-
ready been given by the defendant in its newspaper; and
the later publications were occasioned by the plaintiff's
political activities in a movement to which the defendant
was confessedly opposed, and their obvious design was to
destroy that movement as a political force in the political
affairs of Los Angeles. It was, therefore, evidently the
immediate purpose of the publications complained of to de-
grade and belittle the plaintiff and his associates in the
movement in the estimation of the local public and thus
interpose, if it could be done, an effectual handicap to the
avowed purposes of the local political organization of
which they were the prime promoters and through the
medium of which the plaintiff and his associates, as they
pretended, were attempting to accomplish certain reforms
in the affairs of the city government of Los Angeles. On
the other hand, the excluded article merely involved a recital
as a matter of news, which was obviously of interest to the
public, of the facts relative to the alteration of the record
and the explanations of the plaintiff and others of the
matters leading up to the changing of the record. There
was absolutely nothing on the face of said article indicating
in the slightest degree that it was published with the design
of defaming or injuring the personal character of the plain-
tiff or of impairing his standing in the community either as
a citizen or as a member of the legal profession. In fact,
the portion of the article giving the plaintiff's version of
how the record came to be altered was under the subhead,
"A Clear Explanation," and gave, without in any manner
questioning either directly or by innuendo the honesty of
the plaintiff's statement of the facts of the transaction
and the facts which he appeared to think justified his act,
the full story of the affair as detailed by him. In brief,

the article was one the publication of which is within the legitimate rights of the defendant as the publisher of a newspaper whose primary purpose is to chronicle and give to its patrons the current events and news, particularly those events or matters, such as the one which constituted the subject matter of the article here, affecting the public interests and which the public are concerned with and entitled to know about. But, while this is all true, the purpose of the publication of said article and the evident purpose for which the cartoon and subsequent articles complained of were published were, as above declared, entirely disconnected, and it follows that, as before stated, the first or excluded news article could throw no light upon the question whether the cartoon and the subsequent publications concerning the plaintiff and based upon his act in causing the record to be altered, were published with or without malice or with or without a design by the defendant thereby to defame and destroy the reputation or the standing of the plaintiff in the community in which he resided and carried on his professional activities.

[5] Nor was the article of September 22, 1909, admissible, as is the contention, upon the theory that it would tend to show, as in mitigation of damages, that the publications complained of bore "a restricted meaning" and that it was in the sense of such meaning that all, "or a large portion of defendant's readers understood to attach to the publications sued on." The meaning of the publications sued on seems to be clear and unmistakable. They are in ordinary language, easily and readily to be understood by the average person who might peruse them. They could have no "restricted meaning," if by that expression it is meant that they bore any other meaning than that the plaintiff was a hypocrite and had habitually practiced and perpetrated the crime of altering public records. No one reading the articles and inspecting the cartoon with its accompanying words, which form the basis of this action by plaintiff, could but conclude that, if said articles and cartoon spoke the truth, then the plaintiff was a hypocrite and a criminal. Indeed, so unquestionably clear is the meaning of those publications that the supreme court, as has been shown, in the opinion on the former appeal, characterized them as libelous *per se*—that is, libelous in

and of themselves, or upon their face, and further said, as will be observed from the above excerpt from its opinion: "Newby was not named in the cartoon, but it is practically conceded that the picture was sufficiently like him to be readily recognized by all who knew him. No person of ordinary intelligence could fail to perceive that the cartoon was intended to suggest that the plaintiff was a hypocrite, posing as a reformer."

The publications upon which the charge of libel is here based speak for themselves. No extrinsic evidence was or is necessary to explain their meaning or the motive prompting them. The excluded article could neither have furnished an explanation which would disclose a different meaning to the language of the publications or to the cartoon sued on from that which their language and the representations contained in the cartoon naturally and plainly imply, nor have disclosed or tended to show that the latter publications were made without malice or were justified. It, in brief, was inadmissible as evidence for any purpose.

[6] The rule is that evidence *aliunde* the publication sued on is admissible, as in mitigation of damages, only where it is manifest that such evidence can and will show or tend to show that the defendant, in making the publication complained of, acted in good faith and with honesty of purpose, and not maliciously. The defendant may show, if he can, that the remainder of the libel not set out in the pleadings modifies the words sued on, or other passages in the same publication qualify them. "But he may not put in passages contained in a subsequent and distinct publication, unless the words sued on are equivocal or ambiguous." (Newell on Slander and Libel, 2d ed., sec. 78. See, also, *Wilson* v. *Fitch,* 41 Cal. 363; *Preston* v. *Frey,* 91 Cal. 107, 110, [27 Pac. 533]; *Davis* v. *Hearst,* 160 Cal. 143, 182, [116 Pac. 530].) Of course, there can be discerned no distinction in principle between the disallowance as evidence of subsequent articles and of publications as evidence made previously to the publication sued on. [7] The test of the admissibility or nonadmissibility of publications other than those complained of is whether such articles will or will not tend to show facts which should properly be considered as in mitigation of

damages or tend to show an absence of actual malice in the publication complained of.

There are some cases cited by appellant which it conceives justifies it in challenging the soundness of the ruling excluding as evidence the article in question. They are: *Bettner* v. *Holt,* 70 Cal. 270, [11 Pac. 713]; *Van Vactor* v. *Walkup,* 46 Cal. 124; *Rocky Mountain Printing Co.* v. *Fridborn,* 46 Colo. 440, [24 L. R. A. (N. S.) 891, 104 Pac. 956]; *Gould* v. *Weed,* 12 Wend. (N. Y.) 12; *Sanford* v. *Rowley,* 93 Mich. 119, [52 N. W. 1119]; *Young* v. *Gilbert,* 93 Ill. 595; *Scripps* v. *Foster,* 41 Mich. 742, [3 N. W. 216]; *McLean* v. *Caverne,* 175 Ill. App. 273.

[8] It would subserve no useful purpose to enter herein upon an examination and such analysis of the decisions in the cases named as will readily show that they are to be distinguished from the present case upon their facts. Referring to them generally, however, it is to be remarked that it cannot be doubted that, as the cases named properly hold, where the meaning or sense of the publication pleaded and so complained of by the plaintiff cannot be apprehended or understood without reference to some other publication upon the same subject, and having reference to the plaintiff, it is competent and proper to receive the latter publication in evidence. For instance, in the case of *Rocky Mountain Printing Co.* v. *Fridborn,* 46 Colo. 440, [24 L. R. A. (N. S.) 891, 104 Pac. 956], *supra,* the words relied upon as defamatory and libelous and which were published under the heading, "Miss Fridborn a mother," were: "Florence Fridborn, the girl who was assaulted by an unknown man in North Denver, last New Year's Eve, became a mother, yesterday." As showing that said item was published without malice and entirely from a news motive, the defendant pleaded the facts of a previous criminal assault upon the plaintiff and the killing of her brother at the same time by an unknown man at a "lonely spot" to which plaintiff, then aged sixteen years, and her brother, then a little over twenty-one years, had repaired for the purpose of skating, and which facts had at the time of the occurrence been published in all the newspapers of Denver, including the appellant's newspaper, the "Rocky Mountain News." The trial court, upon motion, struck from the

answer all those facts. That the publication made the basis of the plaintiff's cause of action in that case was libelous *per se* is an unquestioned proposition, since, from its face, and unexplained, the necessary implication was that the plaintiff, being an unmarried woman and having given birth to a child, had been guilty of fornication, and was, therefore, unchaste. But, inasmuch as the publication involved a statement of the direct result of a previous diabolical assault by a male upon the plaintiff, of the facts and circumstances of which assault the defendant had, as a matter of news, and legitimately as the publisher of a newspaper, made publication, it was eminently proper, and the supreme court of Colorado so held, that the matters stricken from defendant's pleading, involving the previous publication by it of the assault and the circumstances attending it, should have been allowed to remain, subject to be proved, if not as a defense, certainly to cut off any ground for the just infliction of punitive damages. And in any case of libel, where the words published and complained of are not clear and unambiguous in meaning, or where the publication sued on is so connected with a previous or subsequent one as that it is necessary to read them together to get the true meaning of the publication complained of, or where it appears that the true meaning of the latter may be in such language as to make it doubtful whether the true or intended meaning thereof may be grasped or understood by the average person, testimony extrinsic to the publication sued on tending to show what its words mean or were intended to mean may be received, and this for the purpose of removing from the publication the sting of malice if the words themselves are, upon their face, defamatory and libelous.

The other cases cited by appellant above named are likewise to be differentiated from this. In some of the cases certain portions only of the publication complained of were relied upon as the foundation for the cause of action pleaded, but it was held therein, and very properly so, that the defendant was entitled to have in evidence the entire article or publication upon the theory that, when the publication is considered in its entirety, the conclusion may be justified that there is either an entire absence of malice in the act of publishing the article or

there appeared in the portions omitted from the complaint certain facts which might tend justly to minimize even compensatory or actual damages.

[9] Counsel for the plaintiff, over objection by defendant, was permitted to ask General Otis, president and general manager of the defendant at the time the publications complained of were made, whether he entertained ill feeling against the several persons caricatured and included in the cartoon other than the plaintiff, and this ruling is assigned as prejudicial error. The witness, in response to questions on that line of cross-examination, stated that some of the persons included in the cartoon he was not personally acquainted with, that as to one of them he could say that he was unfriendly with, and that as to another he was politically not friendly with. Personally, he was not acquainted with plaintiff, he declared.

We are not prepared to say that the cross-examination thus challenged was not pertinent and proper. The object of the attack involved in the cartoon and the articles complained of was to destroy the force of a political organization of which the parties caricatured and included in the cartoon were the leading promoters and to which the defendant appears to have launched a relentless opposition, and, in prosecuting such opposition with any hope of success the defendant seems to have conceived that the first and important requisite was to attack and so destroy the personal reputation of the individuals constituting the subjects of the cartoon. If the cause to crystallize which the persons referred to in the cartoon was for a bad purpose or one not calculated to be the instrument for promoting the public welfare, or the parties prosecuting it were doing so to consummate some sinister personal purpose, which latter proposition seems to be the imputation against them as implied from the publications complained of, then the banding together of those persons for that purpose was, according to the fair and reasonable import of said publications, no less than a criminal conspiracy or at least one whose ultimate mission was to perpetrate a political wrong of some sort upon the city and the county of Los Angeles. Hence, it would seem that, if the defendant's general manager, who controlled the policies of the defendant, entertained ill feeling, politically, against any of the parties

46 Cal. App.—9

associated by the defendant with the plaintiff in a cause which
it opposed because either the purposes of the cause or those
of its promoters were inimical to the best interests of the
public, such ill feeling, if shown, would afford some in-
ference that he entertained a like feeling toward the
plaintiff. It might be somewhat of a remote inference,
but this goes only to the question of its evidentiary value,
the determination of which was, of course, with the jury.
Manifestly, the testimony sought to be elicited by the
cross-examination would not be proper for the purpose
only of showing that the defendant had been guilty of
libeling the other parties associated with plaintiff in the
cartoon, and, as we have shown, this was not its purpose,
although, incidentally, it might have tended to show that to
be the fact. The cases cited by appellant, therefore, are
not applicable to the discussion. They are: *Cochran* v.
*Butterfield,* 18 N. H. 115, [45 Am. Dec. 363]; *Stowell* v.
*Beagle,* 57 Ill. 97; *York* v. *Pease,* 2 Gray (Mass.), 282.
In those cases proof was offered and received or rejected,
whose effect would be to show either that the defendant
had previously and in different articles published libels
on other persons than the plaintiff, or that the defendant
had previously had a personal difficulty with the plaintiff's
father. The courts in those cases very properly held that
such testimony would not tend to prove that defendant
had maliciously made the publication complained of—
that is, with malice against the plaintiff. But here the
plaintiff is grouped in the same cartoon with others who
are characterized either as dishonest or as prosecuting an
usurious money-lending business, or as having been in a
drunken condition while in the performance of some pub-
lic function, whether official or otherwise is not made clear,
and the group is ironically referred to therein as "our
leading reformers," of whom it is also said therein: "All
hypocrites are sinners, but, thank God, all sinners are not
hypocrites," and, as above stated, it is fair to infer there-
from that the same motive or the feeling actuating the
publication of the cartoon and the words employed tending
to interpret its meaning or purport, cannot well be held
to have been intended to be confined or limited in their
application to any single one of the group, but that it

must have been at the bottom of the publication as to all referred to therein.

But, if we felt compelled to hold with appellant that the cross-examination was legally improper, we would still be of the opinion, in view of the record when considered as a whole, that the ruling permitting it was not productive of a miscarriage of justice. (Const., art. VI, sec. 4½.) As before declared, the publication involving the cartoon was libelous *per se* and there was no showing by the appellant rebutting the implication of malice resulting from or attending such publication. [10] Indeed, the presumption of malice from the publication of a defamatory article in and of itself libelous or actionable *per se* cannot be rebutted, and it is, therefore, the more correct to say that there was no showing by the defendant tending to mitigate damages—that is, a showing that there was in fact no express or actual malice.

In the present connection, we may consider the claim that the verdict is, under the evidence, excessive, and that but for the testimony brought out by the cross-examination of defendant's president and general manager, a verdict for a much less sum than that thus awarded would probably have been the result of the jury's deliberations. But we cannot perceive how it can consistently be held by this court that the damages awarded are, under the evidence, excessive.

It has been held: "If the article is libelous *per se,* we see no reason why the law should not declare that upon its introduction in evidence a *prima facie* case of malice in fact is established, for even though it be presumed malice, it is malice in fact and has all the dignity and gravity of express or actual malice, proven *aliunde.* We conclude that presumed malice is equally a question of fact with actual malice, and upon being established equally forms the foundation for the recovery of exemplary damages." (*Childers* v. *Mercury P. & P. Co.,* 105 Cal. 284, 289, [45 Am. St. Rep. 40, 38 Pac. 903, 904] ; Civ. Code, sec. 3294.) In this case, as stated, there is no showing that the defendant had justification or excuse for publishing the plaintiff to the world as a hypocrite and a man who was in the habit of unauthorizedly altering public records, a crime

under the laws of the state, and there is, therefore, no proof disclosing an absence of actual malice in the publications complained of, hence the malice implied or presumed from said publications because of their inherent defamatory and libelous character stands in the record as malice in fact. [11] But, to the complaint against the size of the verdict, there is still another answer, to wit: That, among the elements of actual damage which may be considered and made a part of the bases of the actual detriment suffered by the plaintiff from the publications, is not only the loss of reputation, but also the shame, the mortification and injury to feelings, etc., and of these elements it has been said: "While special damages must be alleged and proved, general damages for outrage to feelings and loss of reputation need not be alleged in detail, and may be recovered in the absence of actual proof; and to the amount that the jury estimates will fairly compensate plaintiff for the injury done. (*Wilson* v. *Fitch,* 41 Cal. 386; *Childers* v. *Mercury P. & P. Co.,* 105 Cal. 289, [45 Am. St. Rep. 40, 38 Pac. 903].) The court in this case clearly instructed the jury as to the measure of damages in such a case and also stated the elements which they were to consider in determining the damages which would compensate the plaintiff for the injury or damage he had suffered from the publication, and we do not see our way clear to declare, as a matter of law, that the award of the jury (seven thousand five hundred dollars), viewed even as involving only the allowance of compensatory damages, represents anything more than fair and reasonable compensation for the injury actually sustained. [12] There is no scale or definite standard by which such wrongs as the one here complained of can be accurately measured and determined, and they must, therefore, be judged and appreciated by the view taken of them as they are made to appear by the circumstances of each particular case by fair-minded and impartial men, and the question of the amount of damages which would represent just compensation in this class of cases hardly admits of any other test than the intelligence of a jury, governed by a sense of justice, and unless it clearly appears that the amount of damages allowed could only have been arrived at through passion or prejudice, it does not rest with the courts to set the verdict aside. If the verdict

is to be construed as implying, as the jury were apparently
warranted from the record before them in finding, that the
publications declared upon were prompted by actual malice,
then, obviously, the verdict may well be said to demon-
strate on the part of the jury very liberal consideration of
the defendant.

[13] It is lastly contended that there was prejudicial
error in the ruling disallowing the witness, Austin, to
testify whether he, having as a reporter of the defendant
written the article of September 22, 1909, had any malice
against the plaintiff at the time of or in writing said article,
or "if he at that time, or at any other time, had received
any instructions from his superior officers in the defendant
corporation to villify or persecute or libel, or do anything
unfriendly to Mr. Newby."

The ruling was not erroneous. As above shown said ar-
ticle merely involved a recital or statement of the facts
and circumstances leading up to and immediately attending
the act of changing the record of the entry of the satisfaction
of the judgment in the Blumer-Mayhew case as they were
admitted by the plaintiff to have occurred. There is no
claim by the plaintiff that said article was published with
malice or that there was anything untrue in its statement
of the facts of the transaction to which it related. It was,
as before stated, nothing more nor less than a news article,
giving the unexaggerated, uncolored statements of the parties
to each side of the controversy arising out of the transac-
tion, the truth of which, so far as was concerned the act
itself of altering the record, was not disputed but was
admitted by plaintiff. The case of *Brown* v. *Massachu-
setts Title Ins. Co.*, 151 Mass. 127, [23 N. E. 733], does not
support the position of appellant upon the point under con-
sideration. There the president and the vice-president and
general manager of the defendant were allowed to testify,
over objection by plaintiff, that neither they nor any
other officer or employee of defendant had any hatred or ill
will or malicious intention toward the plaintiff in the
publication of the alleged libel, and the court, on review,
held that that testimony was competent and proper for
the purpose of showing an absence of ill will or malice
against plaintiff in the publication. There can be no just
criticism of that ruling. The case here is different. A re-

porter of a newspaper, having no other connection therewith, is a mere employee with no power or authority over the policies of the paper. He, as a rule, in the discharge of his duties as a reporter, must follow the established policies of the newspaper with which he is thus connected and has nothing to do with the character of the publications made by the newspaper. And in the very case cited by appellant and above referred to (*Brown* v. *Massachusetts Title Ins. Co.*, 151 Mass. 127) it is said, at page 129, [23 N. E. 733] : "If either witness (that is, either the president or the vice-president and general manager of the defendant in that case) had nothing to do with the publication, his evidence would be immaterial; if it was claimed that either one made or authorized the publication, his evidence would be material."

And to the above we may add that the burden was upon the defendant to show that the witnesses named made or authorized the publication. So it is true in this case. No question was asked of the witness Austin the object of which was to show, nor was there otherwise any testimony showing or tending to show, that he (Austin) authorized or was in any way responsible for the publications complained of, or had any authority to control the policy of the defendant, or direct what publications should or should not be made by the defendant.

No other points are made.

In accordance with the views herein set forth, the judgment appealed from is affirmed.

Ellison, P. J., *pro tem.*, and Burnett, J., concurred.