**SWIFT & CO. v. GRAY.**
No. 8843.

Circuit Court. of Appeals, Ninth Circuit.
Feb. 23, 1939.

Herman Phleger, Maurice E. Harrison, T. L. Smart, and Moses Lasky, all of San Francisco, Cal. (Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for appellant.

John M. Welsh and Butler, Van Dyke & Harris, all of Sacramento, Cal., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

Harry J. Gray, as plaintiff, filed a complaint in the Superior Court of the State of California, County of Sacramento, against Swift and Company, alleging that defendant had defamed and slandered him, and demanding damages for the injury to his reputation. The defendant filed a petition for removal to the United States District Court, the cause was removed thereto, and defendant answered. The cause was tried before the court and jury and a verdict in favor of plaintiff was returned in the sum of $1,750, and judgment entered thereon. The defendant appeals.

In October, 1933, the appellee became a truck route driver for appellant, carrying a supply of bacon, sausage, etc., on a truck, calling on the trade and selling appellant's products from said truck. His territory or route extended from South San Francisco to Palo Alto. Each day he would order supplies from the order clerk for his sales and deliveries for the following day. The route drivers had sales books in which they entered the sales. Each entry was made in triplicate, one copy being left with the customer and the others were retained by the driver-salesman to be turned over to the cashier. Sales were either cash or charge. A strict account of all goods placed on the truck was kept, as well as goods sold and how much remained on the truck at the end of the week. All sales tags were numbered and a record kept of sales books issued to each driver, so that each tag could be accounted for.

It was the duty of the driver to turn over to the cashier each day all sales tags and moneys collected. This was to be done at the conclusion of each day's business when the driver had finished his run. For the first several months he held the position, Gray complied with the company rules in this regard, but later, because he worked extremely long hours and the cashier had usually closed his cage for the day and left the premises, Gray adopted the practice of retaining his sales tags and cash receipts overnight, placing them in an envelope which, each morning, he threw through a small opening, into a corner of the cashier's cage, the latter arriving after Gray had gone out on his morning run. Gray assigned as his reason for retaining the tags and cash overnight that the night clerk or watchman refused to give him a receipt for them.

Apparently all proceeded uneventfully until Saturday, October 13, 1934, on which day Gray was to and did start his vacation. For a few days immediately preceding Gray had been accompanied over his route by a Eugene Harbinson, who was to take his place during vacation and who was learning the route. According to Gray's testimony, Friday evening, October 12, 1934, after completing his daily run, he returned to the Swift plant in South San Francisco at 7:30 or 7:45 p.m. No one was there to receive his days receipts and

sales tags, so he took them to his hotel. He arrived at the plant at about 7:15 Saturday morning, and threw the envelope in which he had placed the receipts and sales tags, into a far corner of the cashier's cage. This "cage" is described as being about 12 x 15 feet in area, surrounded by a counter about waist high, upon which was a wire screen extending to within 3 or 4 feet of the ceiling. Entrance was through a door which was always kept locked. The cashier transacted his business through two small holes or openings in the screen.

After disposing of the envelope Saturday morning Gray set out on his route, accompanied by Harbinson, returning to the plant at 12:30 p.m. After checking-in his merchandise, he made up his receipts and certain other reports and deposited them. Shortly thereafter the cashier asked him for his cash collection book for Friday, stating it had not been received. Gray told the cashier he had left it in the morning along with the cash receipts, and upon the cashier reiterating that he had received neither, a search of the cage was made in the presence of the cashier, Harbinson, and Irving Everett, the assistant sales manager. The search extended to the office proper, and to the trash cans. Gray then said that he did not wish to forego his vacation, having planned it for some time, and offered to make a list of the customers to whom he sold goods on the day preceding, stating that he had salary enough owing him to cover the amount of the missing receipts.

Returning, two weeks later, Gray was informed by Harbinson, who had taken his place, that he was to report to the office Monday morning. He called at the office that Monday morning and Mr. White, the general manager, Mr. Kelly, the sales manager, Mr. Everett, assistant sales manager, Mr. Hamilton, the cashier, and Mr. Hartl, the auditor, were present. Gray testified that Hartl said to him, "Gray, besides that money that was missing the day you left and knew about, we have some twenty or twenty-one other tickets that date as far back as three weeks before you left that have never been turned in. We have it in black and white against you." He was told to make up the deficit or be turned over to the bonding company, and he asked for opportunity to prove his innocence. Thereafter, Gray called on his customers to investigate the facts and afterward, at Hartl's request, gave his check to Hartl in favor of Swift and Company for the amount of the loss. He stopped payment on this check, however, notified Hartl, made further investigation among the customers on the route and then gave another check to cover the deficit. At this time he asked to be placed back on the job and was refused. He then told Mr. White that he knew who the guilty person was, and named the cashier, but White declined to listen.

Gray attempted unsuccessfully to secure employment with different meat packing companies operating in the territory he had served for Swift. He made an attempt to sell vacuum cleaners but did not find the venture profitable, so he went to Los Angeles, where, after four or five months, he obtained steady employment.

In 1935 irregularities were discovered in the cashier's accounts and he was charged with embezzlement and jailed.

Harbinson, who had taken Gray's place on the route, appeared as a witness for the plaintiff. He testified to going over the route to learn it and to the search for the lost cash and tags. He said that on the Monday morning prior to making his first trip alone over the route, immediately following the loss of Gray's Friday receipts, Mr. Everett, the assistant sales manager, said to him, "I want you to go out and check on this shortage." Everett denied giving Harbinson directions to check the route and denied discussing that subject with him at all. Everett stated that he had no personal responsibility in the matter of discrepancies or shortages on the route because such things came under the jurisdiction of the plant auditor and not the sales manager or his assistant. Harbinson testified that following these instructions, he went out on the route and called on the customers whose names were on the list; that he called on several of these customers and requested permission to examine the sales tags of Friday, October 12, 1934; that he was asked why he desired to see the tags; that some of the customers refused him permission until he advanced his reasons; that he told them Gray was "short" in his accounts and the company wanted to ascertain the amounts paid because Gray had not turned in the money to Swift and Company; that he continued this check-up until Tuesday when he met a Mr. Gould, a relief salesman with the Company, who told him he had been sent out to investigate the entire territory.

Harbinson's testimony was corroborated by two witnesses who had been customers of Gray.

Mr. Hartl, the auditor, sent Mr. Gould out to check the route. According to Gould's testimony, nothing whatever was said by him which either referred to or disparaged Gray. On the other hand plaintiff produced three witnesses who testified to remarks made by Gould. One Fred Langbehn testified that Mr. Gould called on him to "check over the bills of things we had bought from Swift and Company" and "asked if he could see the bills;" that "He said the reason he would like to see the bills was it seemed Harry Gray had taken some of Swift's money just before he went on his vacation and they wanted to see just how much he had taken." Mrs. Polly Guptill, a restaurant owner in Burlingame, testified: "Mr. Gould asked to look over the receipts. I asked him why. He answered that the reason was that he was sent out by Swift because Harry was short in his accounts, and he wanted to check up on his cash sales slips. I let him see them. I wouldn't say how many days or what slips he was looking for. He looked at plenty; for several months." Mrs. Dorothy Hamilton Kipps was a waitress in Guptill's restaurant. She testified that she had heard the conversation between Mr. Gould and Mrs. Guptill. She said: "Mr. Gould came in and asked to look over the accounts saying that there was a shortage and he wanted to see what Mr. Gray's accounts were with Swift."

The appellant introduced witnesses and documentary evidence to contradict the testimony of appellee and his witnesses to the effect that nothing was said by any employee of Swift and Company to disparage Gray's character. Everett denied giving directions to Harbinson to check the route, in fact, asserted he "had positively nothing to do with any investigation. * * *" Witness Gould, who had been assigned to investigate the missing sales tickets in Gray's territory, testified that he did not state to any of the customers he called upon that Gray had failed to turn in or had stolen any money or was short in his accounts. He said that when the people inquired as to his reason for inspecting the sales slips he told them that certain tags were "missing." Witnesses White and Hartl, for the appellant, each denied accusing Gray of dishonesty, stealing or embezzlement, asserting that they charged him only with carelessness.

The defendant-appellant moved for a directed verdict, which was denied.

The appellant contends the utterances were made on privileged occasions and were privileged; that in making the alleged statements the appellant's employees were not acting within the scope of their employment; that the words were true and non-defamatory; that certain evidence was erroneously admitted; and that the court erred in its instructions to the jury.

The Civil Code of California defines slander (§ 46), as "a false and unprivileged publication other than libel, which:

"1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

* * * *

"3. Tends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

"4. * * *; or,

"5. Which, by natural consequence, causes actual damage."

There was no malice proven or attempted to be proven. Assuming for purpose of discussion, the statements made were false and defamatory and by persons acting within the scope of their employment, we approach the question of privilege. Section 47 of the Civil Code of California reads, in part:

"A privileged publication is one made—

* * * *

"3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

▮▮▮▮ It will be observed from the quoted code section immediately above, that the one to whom the publication is made must be an "interested" party. The appellant, to whom the statements are attributed, was

interested, but how can the "interest" of the hearers be justified, so as to make the statements or the occasions thereof, privileged? Mere idle curiosity on the part of the hearer is not enough; that the statement be for his protection does make him "interested"; that it must be for his "benefit" we do not find it necessary to hold. We find nothing in the evidence which might have convinced the judge below or, for that matter, convinces us that the persons to whom the statements were made were "interested" to the extent of subdivision 3, Section 47 of the Civil Code of California, and the argument of appellant does not satisfy us in this respect.

There was no duty or obligation resting upon appellant to tell the customers Gray was "short" or that he failed to turn in money to Swift and Company; those statements were of mere convenience or persuasion, in order more readily to secure desired information. And the fact that the customers might have asked, "Why?", did not furnish license for the statements, in the absence of "interest" in the hearers. It was not necessary for the servants of the appellant to say what they did say in order to secure the information they sought regarding the tags, nor was it to the interest of the customers that they learn what Swift and Company thought of the appellee.

■ The general rule on the question of qualified privileged publication of slanderous statements may be stated as follows: "Qualified privilege * * * relates * * * to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice." This definition is found in 36 C.J. § 205, p. 1241; see, also, 17 R.C.L. § 74, p. 328, § 88, p. 341; Newell, Slander and Libel (4th ed.), § 340, p. 380. The texts and encyclopedias on the subject divide privilege into absolute and qualified. We are concerned only with the latter.

It will be noticed that the text and encyclopedia definitions of privilege are drawn with more literary preciseness than that in the Code. For instance, the definition set out in Corpus Juris requires good faith and reasonable grounds for believing the statements true, while the code mentions neither but demands only joint interest. The Supreme Court of the State of California has held, however, that in addition to the absence of malice, the declarant must honestly believe in the truth of the statements made. Snively v. Record Publishing Company, 185 Cal. 565, 576, 198 P. 1. Both Harbinson and Gould testified that they believed Gray was honest and did not embezzle the funds belonging to Swift and Company.

■ The publication, therefore, was not privileged, on the ground of lack of interest and, as well, because the declarants did not believe what their utterances plainly implied. See 36 C.J. § 166, p. 1218.

■ When the essential facts are not disputed, the question whether the communication is privileged is solely a question of law for the determination of the judge. Jones v. Express Pub. Co., 87 Cal.App. 246, 256, 262 P. 78; Newell, Slander and Libel (4th ed.), § 345, p. 383. The trial judge having correctly decided the publication not privileged, there was no error in the refusal of the court to give the instructions requested by the defendant on that subject.

Having proceeded in our discussion of the question of privilege on the assumption that the words spoken were defamatory, we now move to the next point urged by the appellant, namely, "Appellant's employees were not acting in the course or scope of their employment in making the alleged utterances." The appellant contends that Harbinson had no authority to check the route and that, while Gould did have authority to make the investigation, he did not have authority to make the remarks complained of.

■ A corporation could not, itself, slander or libel a person; a corporation can act only through agents. It is the general rule that a corporation may be held "liable for a slander uttered by its agent while acting within the scope of his employment and in the actual performance of the duties thereof touching the matter in question, though the slander was not uttered with the knowledge of the corporation or with its approval and though it did not ratify the act

of the agent." 5 Thomp.Corp. (3d ed.), § 5421, p. 319. See Newell, Slander and Libel (4th ed.), p. 344–346; 13 Am.Jur. § 1127, pp. 1053–1054. It is said in 14a C.J. § 2855, pp. 779–780: "It is well established that a corporation may be liable for a slander uttered by its agent, * * * within the scope of his employment and in the performance of his duties in the course of transacting the business of the corporation. * * * it is not essential to the liability of the corporation that the slanderous words were spoken with its knowledge or approval, or that it ratified the act of its agent or servant."

■ It is nowhere contended that either Harbinson or Gould had been instructed by their superiors to slander Gray, but it is apparent that each had been instructed to check the route, in Gould's case by uncontradicted evidence and in Harbinson's case by his testimony which the jury could have believed. The statements made by them, which are allegedly slanderous statements, were, therefore, within the scope of their duties and hence attributable to the appellant. While Gould denied making any slanderous statements, there was positive testimony that he had done so. Further, the argument that if Everett had given orders to Harbinson, he was without authority to do so, is lacking in merit for the reason that he was Harbinson's superior and, at the time, acting sales manager. The slanderous statements might well be classed as something done in attempting to do what the master has employed or directed the servant to do. Cf. International Text-Book Co. v. Heartt, 4 Cir., 136 F. 129, 133.

It follows, also, as a matter of course, that the court below committed no error in refusing to give any instruction to the effect that the alleged utterances were not within the course or scope of employment of Gould or Harbinson.

For its next point, the appellant asserts that the words uttered, or allegedly uttered, by Gould and Harbinson were true and, as a matter of law, non-defamatory.

The defendant-appellant did not prove or even offer to prove that the words spoken were true. The cashier was not produced or his absence accounted for. By all that appears from the evidence the person designated by the appellant to receive money and sales receipts from the driver-salesmen might have actually received Gray's collections. There was no duty upon Gray to turn over his cash collections and sales tags to the accounting department (that duty seems to have been upon the cashier), and he cannot be held responsible for failure of that department to receive the same.

■ It is quite true that the word "short" may not always impute dishonesty or criminality, but it is likewise true that it may be so used. Cf. Ferguson v. Houston Press Co., Tex.Civ.App., 1 S.W.2d 387, 390. The Supreme Court of the State of California, discussing ambiguous language in Van Vactor v. Walkup, 46 Cal. 124, 133, said: "When the language is ambiguous, that is to say, when it is capable of two meanings, one of which is harmless and the other libelous, it is undoubtedly the province of the jury to determine in which sense it was used. But it is equally clear that it is the province of the Court to determine whether, on its face, the alleged libel is capable of a double meaning. 'It is for the Judge to decide whether the language is capable of the meaning ascribed to it by the innuendo, and for the jury to decide whether such meaning is truly ascribed to it.' . (Townsend on Libel, Sec. 284, and cases there cited.)"

To the same effect is Mellen v. Times-Mirror Co., 167 Cal. 587, 593, 140 P. 277, Ann.Cas.1915C, 766. As used here and as it was understood, it did imply and charge Gray with dishonesty. Where a person is employed to sell merchandise and collect therefor and turn in his collections to his employer, to charge that he is "short" is to impute dishonesty.

To say that one has "taken" money belonging to another and not accounted for it is to say that he has stolen that money.

■ The words spoken must be given the natural and popular construction of the average man and not the critical analysis of the mind trained in technicalities. Western Broadcast Co. v. Times-Mirror Co., 14 Cal.App.2d 120, 124, 57 P.2d 977.

■ The plaintiff "is not required to reproduce with literal precision the identical words set forth in his complaint, but those which are proved to have been spoken must be in substance the same, or have substantially the same meaning." Haub v. Friermuth, 1 Cal.App. 556, 557, 558, 82 P. 571. In Fleet v. Tichenor, 156 Cal. 343, 345, 346, 104 P. 458, 459, 34 L.R.A.,N.S., 323, the Supreme Court of the State of California used the following language: " * * *

982

It is now, and long has been, the generally accepted rule that, where the defendant is charged with the speaking of certain specified slanderous words, it is sufficient to prove the substance of the precise words alleged, but by this is meant, according to the overwhelming weight of authority, not that it is sufficient to show the speaking of other words which would produce an impression similar to that which the words alleged would produce, but, as was said by Justice Taggart in the opinion rendered by the district court of appeal in this case: 'Substantial proof of the words only is required as distinguished from a literal proof of the words alleged in the complaint, as was the original rule. The rule is not that the substance of the words alleged must be proved, but that the words alleged in the declaration, or enough of them to amount to a charge of the particular offense alleged to have been imputed, must be substantially proved.' In other words, so many of the words alleged in the declaration 'as constitute the sting of the charge' * * *, or so many of such words alleged as contain 'the poison to the character and constitute the precise charge of slander averred' * * *, must be substantially proved."

We are convinced that the court below is chargeable with no error in the trial of the case which would justify reversal.

The judgment is affirmed.