[Civ. No. 35362. Second Dist., Div. Five. Dec. 10, 1970.]

SAMSON B. MULLINS, as President of the Oakland Police Officers Association, et al., Plaintiffs and Appellants, v.
MARLON BRANDO, Defendant and Respondent.

**COUNSEL**

Pettis & Brott and Peter A. Bertino for Plaintiffs and Appellants.

Rosenfeld, Meyer & Susman, Norman H. Garey and Stephen A. Kroft for Defendant and Respondent.

**OPINION**

**KAUS, P. J.**—Plaintiffs appeal from a judgment entered after defendant's general demurrer to their second amended complaint was sustained with leave to amend and no amendment was filed.

There are two sets of plaintiffs. Those whom we shall call the "individual plaintiffs" (Robert Coffman, Robert Fredericks and Owen C. Brown) identify themselves as police officers who were involved in a confrontation in the course of which they fired shots at one Bobby Hutton. The fourth plaintiff is Samson P. Mullins who describes himself to the court as the president of the Oakland Police Officers Association (OPOA) and states that he is suing on behalf of OPOA as well as on behalf of its members. OPOA is an unincorporated association made up of all of the members of the Oakland Police Department, about 650 in number. We shall refer to Mullins and the other members of OPOA as the "OPOA plaintiffs."

Factually the complaint alleges that on April 25, 1968, the defendant appeared as a guest on a television program where he was interviewed by Joey Bishop, the host of the show. The program was heard by millions of persons, including residents of Alameda County. During the program defendant made a statement concerning the death of one Bobby Hutton, a member of the Black Panthers.

In defendant's statement he describes reasons why he had decided to investigate "what it is to be black in this country" and "what this rage is all about." He said he had traveled to the San Francisco-Oakland area, "a place which could be considered the center of rage." There he had visited with certain Black Panthers. He continued: "I heard their views and I listened to their thoughts and I was told that the police department was out to get the Panthers. One of the guys I met up there was a kid by the name of Bobby Hutton. . . . He was 17 years old. . . . A beautiful kid. And in two days he was in a shoot-out with the police. He came out of the house with his hands up and he was told to run for the car and he was shot dead and killed. And I subsequently went to his funeral and I saw that kid lying in the coffin and I thought . . . he'd been in the Panthers for two years and I thought . . . what was he doing there. What was he doing with a gun in his hand blazing at the police. How did it happen that———"

Defendant's interviewer then, helpfully, interrupted and asked: "You did say prior to this that he came out without . . . with his hands up." Defendant replied: "He was told to come out. They surrendered and he came out with his hands full up and he was told to run for the car. And he was shot down in front of any number of witnesses. . . ."

The operative words obviously are: 1. that defendant was told that the police department was out to "get the Panthers"; 2. that Hutton "came out of the house with his hands up and he was told to run for the car and he was shot dead and killed"; and 3. a variant of this statement to the effect that Hutton "was told to come out. They surrendered and he came out with his

hands full up and he was told to run for the car. And he was shot down in front of any number of witnesses."

The complaint then alleges on April 6, 1968, there had been a "gun battle" which had been provoked by members of the Black Panthers. Members of the Oakland, Emeryville[1] and other police departments participated. The individual plaintiffs fired pistols at Bobby Hutton, but do not know which shots fired by them found their mark.

The innuendo pleaded in the complaint is that OPOA and its members were out to "get" the Black Panthers by violent means, that in pursuance of that aim they deliberately became involved in the gun battle during which Hutton was shot, that Hutton was "deceived" to run to an automobile, that he was then deliberately killed and that "OPOA and the members of OPOA are and were of the mentality and disposition to use murder, deceit and ambush and other illegal actions as a policy for and means of performing [their] duties and that [they] did in fact use such means and implement said policy in reference to Bobby Hutton. . . ."

The complaint also contains allegations of falsity, malice, an unheeded demand for retraction pursuant to section 48a of the Civil Code and of general, as well as punitive damages. No special damages are claimed. Allegations of malice which are claimed to be insufficient will be discussed below.

The record filed with this court does not show by what arguments defendant persuaded the trial court that his general demurrer was good.[2] Before this court he contends: 1. his statement is not reasonably susceptible of a meaning that brings it within any of the first four subdivisions of section 46 of the Civil Code; therefore, since he is charged with slander, rather than libel, he is not liable without a pleading of special damages; 2. one of the rules applied in *New York Times Co. v. Sullivan*, 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], forbids a finding that his statement referred to any or all plaintiffs; 3. in any event plaintiffs have not adequately pleaded that the statement was made "of or concerning" them; 4. neither OPOA as an entity nor the OPOA plaintiffs, as a class, have shown any cause of action in themselves; 5. apart from *New York Times Co. v. Sullivan, supra*, defendant's statement is privileged under subdvision 3 of section 47 of the Civil Code, malice having been inadequately alleged.

We have come to the conclusion that the judgment must be reversed

---

[1]Plaintiff Brown is a member of the Emeryville Police Department. He is apparently not a member of OPOA.

[2]Defendant did file one special demurrer for uncertainty, claiming that it could not be ascertained "in what manner or in what respect the alleged utterance was false." The record shows that the trial court's ruling was not based on the special demurrer. Had it been, it would have been erroneous.

insofar as it affects the individual plaintiffs, but should be affirmed as far as the OPOA plaintiffs are concerned. We shall first discuss the formers' case.

### The Individual Plaintiffs

It is, of course, conceded by plaintiffs that, in the absence of special damages, they can only recover if defendant's statement comes within any of the first four subdivisions of section 46 of the Civil Code. They urge, however, that, reasonably interpreted, defendant's statement amounted to a charge of a crime and, further, that it tended directly to injure them in respect to their profession by imputing to them a general disqualification in respects which their occupation peculiarly required. It seems obvious to us that a reasonable, if not the only possible, interpretation of defendant's statement is that after Hutton surrendered with his hands up[3] and, on command, had run to an automobile he was "shot dead and killed." In the context of the entire statement it seems clear—or at least a jury could so find—that defendant was not talking about an accidental killing, a killing in self-defense, or even a negligent homicide, but was implying murder—an execution.

Defendant now argues that no such charge could reasonably be inferred from his statement because it "does not state that Hutton did not have a gun in his hands when he was allegedly shot and killed." Such an argument reminds one of Prosser's parade of horribles: "The reluctance with which the common law courts at first entertained actions for defamation led them to hold that words must be interpreted in the best possible sense, and that the plaintiff must negative any possible nondefamatory meaning. The result was a set of artificial and absurd rules of pleading and proof, by which 'Thou art as arrant a thief as any is in England' was not actionable until it was pleaded that there were thieves in England, and 'Thou art a murderer, for thou art the fellow that didst kill Mr. Sydnam's man' required an averment that any man of Mr. Sydnam's had in fact been murdered. . . ."[4] (Prosser, Law of Torts (3d ed. 1964) ch. 21, § 106, p. 764.)

This state is no stranger to similar attitudes. A line of cases, since disapproved in *MacLeod* v. *Tribune Publishing Company,* 52 Cal.2d 536, 549-551 [343 P.2d 36], required pleaders, at least in certain cases, to negative by way of inducement and innuendo that the alleged defamatory state-

---

[3]When defendant repeated the statement it was "full up."

[4]These cases are probably just examples of what Justice Holmes has described as "the inability of the seventeenth century common law to understand or accept a pleading that did not exclude every misinterpretation capable of occurring to intelligence fired with a desire to pervert." (*Paraiso* v. *United States,* 207 U.S. 368, 372 [52 L.Ed. 249, 251, 28 S.Ct. 127].)

ment did not have a possible innocent meaning. (*Peabody* v. *Barham,* 52 Cal.App.2d 581, 584 [126 P.2d 668].) Such, of course, is no longer the law. ■ We now measure the defamatory impact of the publication ". . . not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader. A defendant is liable for what is insinuated, as well as for what is stated explicitly. . . ." (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at p. 547; see also *Kapellas* v. *Kofman,* 1 Cal. 3d 20, 34 [81 Cal.Rptr. 360, 459 P.2d 912].)

■ Further it is too well established to require citation of authorities that the defendant's utterance must be judged as a whole and in the context in which it was made. ■ It seems hardly likely that a reasonable viewer of the program on which defendant appeared would believe that defendant thought it was worth the attention of a coast-to-coast audience that certain Oakland police officers had killed somebody in self-defense. It seems plain to us that he issued a charge, not a vindication.

Defendant places great reliance in *Greenbelt Coop. Pub. Asso.* v. *Bresler,* 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537], decided on May 18, 1970.[5] There a newspaper article reported various public meetings at which several people described the plaintiff's negotiating position with respect to a zoning matter as "blackmail." In addition a column subheading consisting of the one word "blackmail." A judgment for the plaintiff was reversed for two reasons. First, the trial court's instructions ran afoul of the constitutional standard of "actual" malice. Second, the Supreme Court found that even under proper instructions the judgment violated the First Amendment. The newspaper reports in question had correctly described the plaintiff's negotiations with the public entity concerned and it was clear that he had not committed the crime of blackmail as defined by the law of Maryland. Thus, said the court; ". . . even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime." (*Greenbelt Coop. Pub. Asso.* v. *Bresler, supra,* 398 U.S. at p. 14 [26 L.Ed.2d at p. 15].)

[5]*Greenbelt* is one of the several decisions which follow and apply the rule of *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, which case strictly delimits the power of states to discourage criticism of public officials by the application of defamation laws violative of the First Amendment. Plaintiffs properly concede that First Amendment considerations apply to criticism of police officers and departments. The cases are collected in 19 American Law Reports, Third Series, pages 1361, 1375-1377.

The distinction between *Greenbelt* and the case at bar is too obvious to require elaborate analysis. If defendant had described criminally innocuous conduct and had chosen to call it murder, he might have a point. Instead he stated facts which, reasonably interpreted, charged the individual plaintiffs with criminal homicide.

In view of the conclusion we have reached it is unnecessary to discuss whether the utterance also tended to injure the individual plaintiffs' professional reputations.

(4) Defendant makes a lengthy argument that "as a matter of constitutional law the alleged utterance is not 'of and concerning' the OPOA as an entity or as a class" and that "its criticism of government is absolutely privileged as a matter of constitutional law." When we read his brief it seemed to us that these points were being advanced against the OPOA plaintiffs only.[6] At the oral argument, however, we were told that defendant does indeed make his points with respect to all plaintiffs. We shall therefore try to deal with them as best as we can, although we must confess that we may misunderstand the drift of the argument.

It will be recalled that in *New York Times* the Supreme Court, after delimiting "a state's power to award damages for libel in actions brought by public officials against critics of their official conduct" reviewed in detail the evidence that had been offered at the trial. It first held that the proof of actual malice was inadequate. It then held—and this is the part of the opinion on which defendant now relies—that the evidence was also constitutionally defective in that "it was incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' " the plaintiff. Sullivan was, of course, one of the elected commissioners in Montgomery, Alabama, and charged with the supervision of the police department. The only two statements in the defendant's publication which concerned police functions were these: 1. that "truck loads of police . . . ringed the Alabama State College Campus" after a demonstration; and 2. that Doctor Martin Luther King had been "arrested . . . seven times." These statements were false only in that the police had merely been deployed near the campus, which deployment did not follow the demonstration in question and in that Doctor King had been arrested only four times. Nowhere in the publication was it asserted that Sullivan was personally involved in any of the incidents. Evidence that the statements referred to him consisted solely of testimony by several witnesses to the effect that because of Sullivan's official position they assumed that the publication charged him with ordering or approving the police actions or being other-

[6] As will be seen the judgment against them must be affirmed on independent state grounds and we shall therefore not reach the constitutional issue.

wise personally involved. The Alabama Supreme Court had held that inasmuch as it was common knowledge that police departments are under the control of commissioners, praise or criticism of the department is usually attached to the official in control.

Such reasoning was found to be constitutionally impermissible: "This proposition has disquieting implications for criticism of governmental conduct. For good reason, 'no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.' *City of Chicago v. Tribune Co.* 307 Ill 595, 601, 139 NE 86, 88 (1923). The present proposition would sidestep this obstacle by transmuting criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed. There is no legal alchemy by which a State may thus create the cause of action that would otherwise be denied for a publication which, as respondent himself said of the advertisement, 'reflects not only on me but on the other Commissioners and the community.' Raising as it does the possibility that a good-faith critic of government will be penalized for his criticism, the proposition relied on by the Alabama courts strikes at the very center of the constitutionally protected area of free expression. [Fn. 30 omitted.] We hold that such a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel on an official responsible for those operations. . . ." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 291-292 [11 L.Ed.2d at p. 713].)[7]

While the passage quoted from *New York Times* may well apply to the OPOA plaintiffs, we do not understand how defendant can use it as a shield with respect to the individual plaintiffs. There is an obvious factual distinction. In *New York Times,* after a trial, all that the plaintiff could prove was that certain witnesses had thought that he was personally in-

---

[7]Reference to the plight of "good-faith" critics of government seems, at first, puzzling. Such critics should prevail even if their defamatory utterance singles out the plaintiff by name. They do not speak with "actual malice." The explanation lies, we believe, in a quirk of the common law of defamation. As far as the identity of the person defamed is concerned, it is a tort of strict liability which, in Prosser's words, places "the printed, written or spoken word in the same class with the use of explosives or the keeping of dangerous animals." (Prosser, Law of Torts (3d ed. 1964) ch. 21, § 108, p. 792; *Cassidy* v. *Daily Mirror Newspapers* (1929) 2 K.B. 331 [69 A.L.R. 720]; *Hulton & Co.* v. *Jones* [1909] 2 K.B. 444 [69 A.L.R. 734].) A defendant may be in entire good faith when launching an "impersonal attack on governmental operations." Thus he may accuse, on adequate though erroneous information, the police of a particular city of habitually rousting Negroes. Yet if by some "legal alchemy" the state may transform such an impersonal attack into a personal attack on the chief of police, the chief may quite easily be able to prove that as to him personally the plaintiff spoke with a reckless disregard for the truth.

volved in the incidents for the sole reason that he was in charge of the police department. Leaving aside the triviality of the falsehoods involved in that case, an entirely different picture would have been presented had the plaintiffs been police officers who were personally involved in the incidents referred to.[8] The rule applied in *New York Times* merely prohibits plaintiffs from coming forward and claiming that they are the victims of defamatory attacks on governmental actions for the only reason that such plaintiffs are, by virtue of their position, legally responsible for the action criticized. (See fn. 7, *ante.*) This is quite apparent from footnote 30 inserted by the Supreme Court: "Insofar as the proposition means only that the statements about police conduct libeled respondent by implicitly criticizing his ability to run the Police Department, recovery is also precluded in this case by the doctrine of fair comment. See American Law Institute, Restatement of Torts (1938), § 607. Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice, as was not done here." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 292, fn. 30.) What the court tells us here is that it is not overlooking the possibility that the publication involved in *New York Times,* was not an "impersonal attack," but libeled Sullivan by criticizing his ability to run the police department. However, if that was the only sting of the libel, it was, of course, defeated by the lack of malice.

 Defendant further maintains that quite regardless of what may or may not have been held or said in *New York Times,* even under traditional principles of defamation law, the individual plaintiffs have not alleged sufficient facts to show that his statement was made or reasonably understood to have been made about them. To make that point he relies

---

[8]The paradoxical nature of Sullivan's position was noted by Professor Kalven in his article *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Supreme Court Review, 191, 199 (Kurland ed.): "The gossamer thread on which defendant's liability depended was made thinner by the fact that in order to show that the statements of fact were untrue, plaintiff had to reverse the logic by which he showed that the statements referred to him. On this aspect of the case, he argued that the arrests of Dr. King, for example, occurred before his tenure as commissioner and that as commissioner he had nothing to do with the perjury indictment. Therefore, he asserted, the statements were false as to him. There is revealed here a new technique by which defamation might be endlessly manufactured. First, it is argued that, contrary to all appearances, a statement referred to the plaintiff; then, that if falsely ascribed to the plaintiff something that he did not do, which should be rather easy to prove about a statement that did not refer to plaintiff in the first place. As it turned out, the Court did not have to confront this logic, which remains temporarily buried for resurrection at some later time."

on the failure of each individual plaintiff to allege whether or not his own shots in fact hit Hutton.[9]

Defendant relies on *Golden North Airways* v. *Tanana Pub. Co.,* 218 F.2d 612, which relying in turn on *Noral* v. *Hearst Publications, Inc., supra,* 40 Cal.App.2d at p. 353 [104 P.2d 860], simply held that where a large group is libeled, individual members of that group do not have a cause of action based merely on membership. That rule is well understood and, as shall be seen, we apply it in this case to the OPOA plaintiffs. The case with respect to the individual plaintiffs is quite different. The very purpose of the individual plaintiffs' criticized allegation is to lay a basis for their contention that they are not just run-of-the-mill members of a large group and that defendant did zero in on them as ascertainable persons. In *Noral* the court held that the general demurrer had been properly sustained because: ". . . An accusation such as that complained of cannot have the quality of a libel unless there be a certainty as to the individuals accused. There is nothing in the published article that makes a personal application to the plaintiff. He cannot by use of the colloquium make the language which is applicable to so large a group of persons be made specifically to refer to him. . . ." (*Noral* v. *Hearst Publications, Inc.,* 40 Cal.App.2d 348, 350 [104 P.2d 860].) In *Noral* there was nothing in the pleading to indicate that when the defendant libeled all officials of the Workers' Alliance, it referred to the plaintiff. That is the very vice of the *Noral* complaint, which the individual plaintiffs overcome.

The claim that plaintiffs could not have been libeled because they did not allege which one of them hit the victim, seems absurd.[10] Perhaps none of their shots did. Perhaps, in truth, Hutton was killed by persons not connected with any police department. The successful pleading of extrinsic facts which indicate that the words in question were spoken concerning the plaintiff does not require a confession of all or part of the innuendo.

Finally defendant claims that malice is inadequately pleaded.

After pleading that the statement made by defendant was intended to be understood as meaning and imputing to plaintiffs that they, in effect, murdered Bobby Hutton, plaintiffs alleged: "Said statement and publication was made by defendants with evil motive and malice, wilfully and wrong-

---

[9]The allegation in question reads as follows: ". . . In the course of the performance of their duties at said time and place, plaintiffs COFFMAN, FREDERICKS and BROWN fired pistols at Bobby Hutton, who is the same Bobby Hutton referred to in Exhibit A. Plaintiffs have no information or belief as to which shots fired by said plaintiffs hit Bobby Hutton."

[10]The clear implication of the allegation in the complaint is that at least one of the three did find his target. We have already noted we are only concerned with a general demurrer.

fully, and with intent to injure, disgrace and defame plaintiffs and with wanton and reckless disregard for the truth or falsity of the statements made."

Before considering the point, we should make it clear just what kind of malice we are talking about. Defendant's argument seems to assume that it is, at least in part, the kind of malice which defeats the privilege recognized by subdivision 3 of section 47 of the Civil Code: "A privileged publication or broadcast is one made— . . . 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information." While defendant does, of course, also talk about the "actual" malice which the Supreme Court in *New York Times* and other cases has recognized as defeating the privilege to criticize public officials, we believe he does himself an injustice in even mentioning malice as defined by the California cases. Such malice is a much broader concept. Thus in *MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536 [343 P.2d 36], the Supreme Court held that malice may be pleaded not only by alleging knowledge of falsity or the lack of an honest belief in the truth of the defamatory statement, but also by claiming a lack of reasonable grounds for believing the statement to be true. Further, under California law, malice is shown if the principal motive of the publication is hatred or ill-will or any cause other than the desire to protect the interest for the protection of which the privilege is given. (*Brewer* v. *Second Baptist Church*, 32 Cal.2d 791 [197 P.2d 713]; *Biggins* v. *Hanson*, 252 Cal.App.2d 16, 20, fn. 2 [59 Cal.Rptr. 897].) There are other ways, such as excessive publication, by which a qualified privilege can be defeated. (*Emde* v. *San Joaquin County etc. Council*, 23 Cal.2d 146, 161 [143 P.2d 20, 150 A.L.R. 916]; *Swift & Co.* v. *Gray*, 101 F.2d 976, 979-980; Rest., Torts, §§ 599-605.) This is, of course, perfectly good state law.[11] It is, however, quite plain that not every form of malice, recognized by state law, meets the constitutional standard for "actual malice" prescribed by *New York Times*. Thus in *Garrison* v. *Louisiana*, 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209], the

---

[11]It still is good law in all areas where the *New York Times* standard is inapplicable. The point is that under traditional tort doctrine, uninfluenced by First Amendment considerations relating to "debate on public issues" (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 270 [11 L.Ed.2d at p. 700]) we recognize forms of malice, or what the Restatement calls "abuse of privilege," in which the speaker's mind with reference to the truth of the charges falls short of the *New York Times* definition of "actual malice." It seems highly unlikely, however, that the United States Supreme Court will tolerate nice inquiries on whether a good-faith critic of a public official published his views excessively, or whether, on the occasion in question, he spoke solely from hatred or ill-will.

defendant had been erroneously found guilty of criminal libel on a finding that he did not have a reasonable belief in the truth of his charges. That sounds a great deal like the "lack of reasonable grounds" of which our cases speak. (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at p. 552; *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d at p. 791.) Similarly in *Greenbelt Coop. Pub. Asso.* v. *Bresler,* 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537], the judgment was reversed because the instructions to the jury defining malice permitted it to pass a finding merely on "spite, hostility or deliberate intention to harm" rather than on "an intent to inflict harm through falsehood." (*Garrison* v. *Louisiana, supra,* 379 U.S. at p. 73 [13 L.Ed.2d at p. 132].)

Learned authority suggests that California courts have been both too severe in applying a requirement of pleading malice with particularity and that they have not been consistent. (See Chadbourn, Grossman, Van Alstyne, California Pleading § 999, and particularly the authors' comments on recent cases cited in the 1968 supplement.) Whatever may be the merits of requiring specificity in pleading when dealing with a many-splendored concept such as the malice referred to in subdivision 3 of section 47 of the Civil Code, the requirement is inappropriate when all the pleader relies on is the simple—though as yet not fully developed—standard laid down by the United States Supreme Court.

The Supreme Court has explained several times what it meant by "actual malice" in *New York Times.* It is either knowledge that the defamatory statement is false or a reckless disregard for the truth. (*St. Amant* v. *Thompson,* 390 U.S. 727, 730 [20 L.Ed.2d 262, 266, 88 S.Ct. 1323]; *Rosenblatt* v. *Baer,* 383 U.S. 75, 84 [15 L.Ed.2d 597, 604, 86 S.Ct. 669]; *Garrison* v. *Louisiana,* 379 U.S. 64, 79 [13 L.Ed.2d 125, 135]; *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 288 [11 L.Ed.2d 686, 711].) The latter is the precise state of mind that plaintiffs have pleaded. We do not see how we can demand more at this stage, particularly when the Supreme Court itself has not given us a conclusive or inclusive definition of the term "reckless disregard." In *St. Amant* it said: " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. . . ." (*St. Amant* v. *Thompson, supra,* 390 U.S. at pp. 730-731 [20 L.Ed.2d at pp. 266-267].)

Plaintiffs rely chiefly on *Noonan* v. *Rousselot,* 239 Cal.App.2d 447, 452-455 [48 Cal.Rptr. 817]. *Noonan* too was a case where malice in the *New York Times* sense had to be pleaded. The court found that the plead-

ing was defective. It was. The complaint there contained two causes of action, one for libel, the other for a tort described by the pleader as a conspiracy to "unfairly deprive a candidate of a fair election." The libel count said nothing whatever about defendant's state of mind with respect to the truth of his charges. It contained a lot of pejorative adjectives and adverbs, conclusions and statements concerning the purpose of defendant's publication, but that was all. The conspiracy count did plead a lack of "good faith" and "fraud," but without further specification. Since fraud has many faces, not all of which involve knowing falsehood or reckless disregard for the truth, the pleading was inadequate.[12]

### The OPOA Plaintiffs

Although it would have been better for the OPOA, as an entity, to sue in its own name, we may overlook that point. (*Daniels* v. *Sanitarium Assn. Inc.,* 59 Cal.2d 602, 608-609 [30 Cal.Rptr. 828, 381 P.2d 652].)

We recognize, of course, that an unincorporated association, such as OPOA, can be defamed. That is precisely what was held in *Daniels*. The only trouble with OPOA's ability to state a cause of action in itself is simply that there is absolutely nothing in defendant's statement or in any innuendo or inducement pleaded which by any stretch of the imagination can be construed as defamatory of the organization. The demurrer was properly sustained in that respect. (See *Washburn* v. *Wright,* 261 Cal. App.2d 789, 793-795 [68 Cal.Rptr. 224].)

Turning to the matter as a class action brought on behalf of each individual member of the organization, we will pass the question whether a class action is an appropriate vehicle for defamation litigation. A recent case, *Los Angeles Fire & Police Protective League* v. *Rodgers,* 7 Cal.App. 3d 419, 425 [86 Cal.Rptr. 623], held, at least by dictum, that it is not. We are perfectly willing to consider that each and every member of OPOA has been individually named as a plaintiff. Still the case must fall on very basic traditional defamation principles.

The problem of defamatory statements about large groups which result in individual members of such groups appearing as plaintiffs in libel or slander actions is not new. The cases are annotated in 70 American Law Reports, Second Series, at page 1382. Omitting citations, Prosser's summary of

---

[12]See definitions in sections 1572, 1573 and 1710 of the Civil Code. Thus one of the definitions of actual fraud, given in subdivision 2 of section 1572 is: "The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true."

the law is quoted in the footnote.[13] The Restatement of Torts is in accord (Rest., Torts § 564, com. c), as is California law (*Noral* v. *Hearst Publications, Inc.,* 40 Cal.App.2d 348 [104 P.2d 860]).

It seems obvious that if no single member of OPOA could have stated a cause of action against defendant, neither can all of them together. Zero plus zero equals zero.

The judgment in favor of the defendant and against the plaintiffs Robert Coffman, Robert Fredericks and Owen C. Brown is reversed. In all other respects it is affirmed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied December 31, 1970, and respondent's petition for a hearing by the Supreme Court was denied February 8, 1971.

---

[13]"Two or more persons may of course be defamed by the same publication. But difficulties arise when the defamatory words are directed at a group or class of persons rather than an individual. The plaintiff must first of all show that he is in fact a member of the class defamed. Beyond this, he must establish some reasonable personal application of the words to himself. If the group is a very large one, as in the case of such words as 'all lawyers are shysters,' they are considered to have no application to anyone in particular, since one might as well defame all mankind. Not only does the group as such have no action, but the plaintiff does not establish any personal reference to himself. But if the plaintiff is the only lawyer present, or for some other reason the words are reasonably understood by the hearers to be directed individually at him, the personal application may be made to appear, by pleading and proof of the special circumstances by way of inducement, and the innuendo. *The rule has been applied quite uniformly to comparatively large groups or classes of a definite number, exceeding, say twenty-five persons.* When the group becomes smaller than that, as in the case of a jury, a family, an election board, or the four officers of an association, the courts have been willing to permit the conclusion that the finger of defamation is pointed at each individual. . . ." (Prosser, Law of Torts (3d ed. 1964), ch. 21, § 106, pp. 767-768. Italics added.)