Sharon M. BARGER, Margaret Diane
Brandes, and Valerie Maria
Gilbert, Plaintiffs,

v.

PLAYBOY ENTERPRISES,
INC., Defendant.

No. C-82-2198-MHP.

United States District Court,
N.D. California.

May 5, 1983.

Kent A. Russell, San Francisco, Cal., for plaintiffs.

Stanley J. Friedman, Lawrence A. Gibbs, Friedman, Sloan & Ross, P.C., San Francisco, Cal., for defendant.

## MEMORANDUM ORDER AND OPINION

PATEL, District Judge.

Plaintiffs filed this libel suit against Playboy Magazine[1] on May 12, 1982 based on its publication of an article (attached as Exhibit A to the complaint) entitled "Undercover Angel" and written by Lawrence Linderman. The article purported to describe the experiences of an undercover narcotics agent, Dan Black, who infiltrated the Hell's Angels. Plaintiffs charged in their original complaint that the article "defamed all wives of members of the Oakland and Richmond chapters of the Hell's Angels Motorcycle Club" by its descriptions of alleged sexual activities of "Hell's Angels brides" and "mommas." The article described an "Angel's wedding" at Clear Lake, California as followed the next morning by assorted sexual activities between the bride and Hell's Angels members other than her husband, and stated that Angels beat up their "mommas" unless they agree to perform unusual sexual acts.

On January 10, 1983, this court dismissed the complaint with leave to amend because it contained factual errors on its face and failed adequately to allege that the article referred to plaintiffs personally and was published with actual malice. The court directed plaintiffs to amend the complaint to allege with specificity facts showing the number of Hell's Angels wives and "mom-

---

**1.** Defendant Hugh Hefner was dismissed by stipulation.

mas," wherever located, and the distinction between those groups, if any. The court further ordered plaintiffs to allege facts showing that defendant published the article with actual malice.

Plaintiffs subsequently filed first and second amended complaints, and defendants have moved to dismiss the second amended complaint for the same defects. Oral argument was heard on March 28, 1983. Having considered the papers submitted and the arguments of counsel, the court now grants defendants' motion to dismiss the complaint without leave to amend.

## I. Failure to Plead "Of and Concerning"

■ Plaintiffs who sue for defamation must show that the allegedly libelous statements were made "of and concerning" them, i.e., referred to them personally. When an article names specific individuals, this is easily done. However, when the statements concern groups, as here, plaintiffs face a more difficult and sometimes insurmountable task. If the group is small and its members easily ascertainable, plaintiffs may succeed. But where the group is large—in general, any group numbering over twenty-five members—the courts in California and other states have consistently held that plaintiffs cannot show that the statements were "of and concerning them," See, e.g., Noral v. Hearst Publications, Inc., 40 Cal.App.2d 348, 350, 104 P.2d 860 (1940); Mullins v. Brando, 13 Cal.App.3d 409, 422–23 & n. 13, 91 Cal.Rptr. 796 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2231, 29 L.Ed.2d 701 (1971), and cases cited therein; Neiman-Marcus v. Lait, 13 F.R.D. 311 (S.D.N.Y.1952). The Noral court, for example, dismissed a complaint for defamation brought by officials of the Workers Alliance based on charges that officials of that group used dues to support Communist activities. Noting that the Alliance had at least 162 officials, the court held that plaintiffs failed to state a claim for libel because "the publication does not defame any ascertainable person.... There is nothing in the published article that makes a personal application to the plaintiff." 40 Cal.App.2d at 350, 104 P.2d 860.

This rule embodies two important public policies. First, where the group referred to is large, the courts presume that no reasonable reader would take the statements as literally applying to each individual member. *Neiman-Marcus* at 316. Second, and most importantly, this limitation on liability safeguards freedom of speech by effecting

> a sound compromise between the conflicting interests involved in libel cases. On the one hand is the societal interest in free press discussions of matters of general concern, and on the other is the individual interest in reputation. The courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements *reasonably susceptible* of special application to a given individual.

*Service Parking Corp. v. Washington Times Co.,* 92 F.2d 502, 505–06 (D.C.Cir.1937) (emphasis added). Indeed, because defamation suits threaten the freedom of speech and of the press protected by the First Amendment, the "of and concerning" requirement may take on constitutional significance. *See New York Times v. Sullivan,* 376 U.S. 254, 288–92, 84 S.Ct. 710, 730–733, 11 L.Ed.2d 686 (1964).

Plaintiffs here allege that they were defamed by the article's statements concerning Hell's Angels "brides" and "mommas." Accordingly, the court must determine whether those terms as used in the article could reasonably refer to groups small enough to meet the "of and concerning" requirement.

Plaintiffs originally contended that the group defamed by the article was "all wives of members of the Oakland and Richmond chapters of the Hell's Angels." Complaint, ¶ 8. In dismissing the first complaint, the court ruled that no reasonable reading of the article could support such a geographical limitation on the groups to which it referred. Although the article describes Black's alleged infiltration of the Oakland and Richmond chapters, it presents his observations as illustrative of the conduct of Hell's Angels and their companions generally. For example, the sentence which intro-

duces the section of the article describing Black's experiences with the Angels refers to the character of the national and even international membership of the Hell's Angels: "[b]y all accounts, the Hell's Angels—with anywhere from 400 to 800 members—are the most lethal group of motorcycle riders in the United States and probably the world." Exh. A. to complaint at 5. Moreover, the alleged defamatory statements about Hell's Angels brides and mommas follow this broad statement by only a few paragraphs and are not presented as subject to any geographical limitations. The court must interpret the article as it would appear to the average reader to decide whether it can reasonably bear the meaning ascribed to it by plaintiff. *See, e.g., MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 550, 343 P.2d 36 (1959); *Mullins v. Thieriot,* 19 Cal.App.3d 302, 304, 97 Cal.Rptr. 27 (1971). Read in the context of the article as a whole, the alleged defamatory statements plainly refer to the women who associate with the Hell's Angels throughout the United States, if not the world.

Because the first complaint revealed on its face inconsistencies with the article attached to it as an exhibit, and because this lawsuit touches on the sensitive area of freedom of speech and of the press, the court ordered plaintiffs to plead the number of members in the groups allegedly defamed. The Ninth Circuit has held that where plaintiff challenges

> conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076, 1082–83 (9th Cir.1976). *Williams v. Gorton,* 529 F.2d 668, 671–72 (9th Cir.1976), *aff'd without opinion,* 566 F.2d 1186 (9th Cir.1977), is *contra.* However, *Williams* preceded *Franchise,* and the court concludes that *Franchise* is better reasoned.

In their second amended complaint, plaintiffs have made a valiant attempt to discover in the unchanged text of the article a new and narrower definition of the group defamed in order to satisfy the "of and concerning" requirement. Abandoning their prior interpretation of the article as defaming Hell's Angels wives by its statements about brides, plaintiffs now contend that not all wives are or ever have been "Hell's Angels brides." Thus, although they admit that wives number approximately 100 to 125 nationwide—well above the threshold for showing "of and concerning"—they claim that "brides" number only about 15 to 20. This alchemy is accomplished by plaintiffs' imaginative interpretation of the term "Hell's Angels bride" as "those females who were married to Hell's Angels members at a wedding ceremony followed by a wedding party of some sort, attended by at least some members of the Hell's Angels Motorcycle Club."

Plaintiffs confess that this reading of "bride" did not occur to them during their scrutiny of the article in preparation of the original complaint and opposition to defendant's first motion to dismiss. At that time, they repeatedly charged that the article defamed "Hell's Angels wives." Only after the court indicated that plaintiffs faced a serious problem in satisfying the "of and concerning" requirement and probed for more careful definitions of terms such as "momma" did plaintiff's attorney and his clients arrive at this new interpretation.

Plaintiff's cannot, however, plead libel by imputing an esoteric meaning to the term "bride" which has no reasonable basis in the article and is inaccessible to the ordinary reader. Under California libel law,

> a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication *according to its natural and popular construction.* That is to say, the publication is to be measured not so much by its effect when subjected to critical analysis of a mind trained in the law, but *by the natural and probable effect upon the mind of*

*the average reader....* [H]air splitting analysis of language has no place in the law of defamation, dealing as it does with the impact of communication between ordinary human beings.

*MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 547, 550, 343 P.2d 36 (1959) (emphasis added). *See also Mullins v. Thieriot,* 19 Cal.App.3d 302, 304, 97 Cal.Rptr. 27 (1971). Accordingly, the court must interpret the term "bride" in the article as it would be understood by the ordinary reader.

The ordinary meaning of "bride" is virtually synonymous with wife: "a woman newly married or about to be married."[2] Websters Third New International Dictionary (1976). Nowhere does the article state or imply that it uses "bride" to mean anything different than a woman newly married to a member of the Hell's Angels. Even if the term "bride" bears a unique meaning in the Hell's Angels' lexicon, that meaning is not accessible to the uninitiated reader of the article. Indeed, it was not initially accessible to plaintiffs. Thus, the article is not "reasonably susceptible," *Service Parking Corp.,* 92 F.2d at 506, to the interpretation which plaintiffs attempt to ascribe to it.[3] The court declines plaintiffs' belated invitation to torture the ordinary meaning of the article to arrive at a definition which no reasonable jury could accept.

Finally, it should be noted that plaintiffs' method of redefining the group libelled, if accepted, would seriously undermine the "of and concerning" limitation on liability. It is as if plaintiffs in the *Noral* case, 40 Cal.App.2d 348, 104 P.2d 860, had claimed that the group libelled was not all "officials of the Workers Alliance," who were accused by the defendant newspaper of diverting dues to Communist activities, but only those among the Alliance officials who aided Communists, who they claimed numbered but a handful. Yet the article spoke in general terms, and it is such generalities which are not actionable.

█ The only other group plaintiffs claim has been defamed by the article is "Hell's Angels mommas," which plaintiffs define as women involved in extra-marital sexual relationships with Hell's Angels members. Plaintiffs admit that this group numbers "at least 500" nationwide. Thus, it is far too numerous to show "of and concerning." Moreover, since "brides" and "mommas" as defined in the complaint are mutually exclusive groups, and plaintiffs claim to belong to the former group only, plaintiffs have not pleaded that the statements about mommas refer to them at all.

█ This is the second amended complaint. Plaintiffs have been on notice since the first motion to dismiss that they must adequately plead "of and concerning." They have failed to do so. This is not a failure which additional time or amendments can cure. In view of the burden on defendant's exercise of its First Amendment rights which would be imposed by unnecessarily prolonging this litigation, the complaint is dismissed with prejudice for failure to state a claim.

## II.  *Inadequate Allegations of Malice*

█ Defendants also moved to dismiss the complaint on the ground that plaintiffs failed adequately to plead malice as defined by the Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. *New York Times* required plaintiffs who are public officials to prove malice in the sense

---

**2.** Indeed, to the degree that there is a relevant difference between "brides" and "wives," the former encompasses a larger group because it may include some who were "about to be married" but in fact never did marry, whereas all wives by definition were once brides. "Brides" would also include former wives, while "wives" might not.

**3.** That the court in alerting plaintiffs to the need to plead the size of the groups allegedly defamed may have probed more deeply than the layperson unskilled in legal technicalities would have does not change the rule that in defamation suits the court must interpret publications as they would be understood by the ordinary reader. Moreover, the court's order required plaintiffs to make more specific allegations regarding "wives," not brides.

of publication of false statements with knowing or reckless disregard for the truth. Subsequent Supreme Court cases have made it clear that malice is very difficult to prove, requiring plaintiffs to show that defendant had "a high degree of awareness of probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74–79, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), and "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), such that defendant had a "subjective awareness of probable falsity." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335 n. 6, 94 S.Ct. 2997, 3005, n. 6, 41 L.Ed.2d 789 (1974). The Supreme Court has extended this requirement to public figures, *see Gertz v. Robert Welch, Inc.,* 418 U.S. at 335–36, 94 S.Ct. at 3005, and plaintiffs have admitted that they are public figures for purposes of this lawsuit. Although this court dismisses the complaint for failure to plead "of and concerning," it is appropriate to rule on the malice issue because of the important First Amendment interests implicated in this lawsuit.

The original complaint contained only broad, conclusory allegations of malice, such as that defendant acted "wantonly," "recklessly" and "with constructive knowledge" of the falsity of the article. The court required plaintiffs to plead malice with greater specificity because of the errors apparent on the face of the complaint and because of the potential chilling effect of a baseless defamation suit on the exercise of defendant's First Amendment rights. *Franchise Realty,* 542 F.2d at 1082–83; *cf. Lewis v. Time, Inc.,* 83 F.R.D. 455 (E.D.Cal. 1979).

■ Although plaintiffs amplified their allegations of malice in the second amended complaint, they remain insufficient. Plaintiffs allege primarily that defendant failed to investigate the statements about Hell's Angels brides and mommas. Failure to investigate does not by itself constitute recklessness. *St. Amant v. Thompson,* 390 U.S. at 731–33, 88 S.Ct. at 1325–1326 (1968), *citing New York Times,* 376 U.S. at 287–88,

84 S.Ct. at 729–730. The Supreme Court expressly recognized that its adoption of a subjective standard for malice may tend to discourage investigation by placing "a premium on ignorance." *St. Amant* 390 U.S. at 731–32, 88 S.Ct. at 1325–1326. It decided, however, that this is not too high a price to pay for the added protection provided to First Amendment freedoms by a subjective rather than an objective standard.

■ Plaintiffs argue that defendant had a higher duty to investigate here because the article was not "hot news." The plurality opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 157, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967), considered the need for quick publication to be a relevant factor, and several courts have followed its lead. *See Carson v. Allied News Co.,* 529 F.2d 206, 211 n. 12 (7th Cir.1976); *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1026 (5th Cir.1975); *Goldwater v. Ginzburg,* 414 F.2d 324, 339 (2d Cir.1969). Under *Butt's* gross negligence type of standard, 388 U.S. at 158, 87 S.Ct. at 1993 ("highly unreasonable conduct"), this was a relevant factor in assessing the publisher's objective duty of care. However, the plurality opinion in *Butts* was superseded by the majority opinion in *St. Amant,* which adopted the stricter subjective awareness of probable falsity standard. 390 U.S. at 731, 88 S.Ct. at 1325–1326. *St. Amant* did not specifically disapprove the "hot" and "cold" news distinction of *Butts.* However, under its subjective standard, the distinction between "hot" and "cold" news loses its significance because the test is no longer what a reasonable publisher should have known, but rather whether the publisher actually knew or entertained serious doubts that the statements were false.

■ Ironically, plaintiffs charge that facts about the article's source revealed in the article itself should have led Playboy to entertain serious doubts about its probable falsity. Plaintiffs claim that the article shows that Black took the drug "speed," committed armed bank robberies, lied and was mentally unstable. Plaintiffs ask the court to assume these parts of the article

were true in order to show that the parts they object to were published with knowledge of probable falsity. The parts of the article they would rely upon, however, must not be torn out of context. The article chronicles the stress and guilt engendered by Black's dangerous assignment as a highly effective undercover narcotics policeman, which forced him to adopt the lifestyle of the Hell's Angels and drug users and then to betray his new companions to the authorities. The article portrays the break-up of Black's marriage, his drug use and subsequent robberies as a product of this tension and his desire to be punished. It does not depict him as a liar, except insofar as it describes his efforts to preserve his "cover." On the contrary, the article describes him as an outstanding narcotics agent whose testimony before a grand jury led to twenty-eight arrests, with twenty-five resulting convictions.

For these reasons, Black's character as revealed in the article was not sufficient to put defendant on notice of probable falsity. At the same time, the publisher responsibly did not conceal from its readers the factors about Black which might affect his credibility. Instead, it enabled its readers to exercise their own judgment. It would be unfortunate indeed if such disclosures laid publishers open to increased liability. The potential chilling effect is obvious.

■ In addition, it should be noted that even if the publisher relied solely on Black, use of a single source does not establish recklessness. *New York Times Co. v. Connor,* 365 F.2d 567, 576 (5th Cir.1966). If the law were otherwise, readers would be deprived of publications about obscure or dangerous subjects for which it is difficult to obtain even one source. The article challenged here may involve just such a subject.

■ Plaintiffs make only two allegations which go beyond failure to investigate. First, they charge that defendant knew that the United States Attorney "failed to confirm" Black's infiltration of the Hell's Angels. The phrase "failure to confirm" is meaningless. Second, plaintiffs charge that defendants learned that Mary

Jo Peterson, described in the article as Black's close companion, was not dead as stated in the original draft of the article. However, the article as *published* does not claim that she died. Therefore, plaintiffs have established at most that defendant corrected the error when it was discovered. The law does not require that such responsible behavior be punished by greater exposure to liability.

Thus, even if all of plaintiffs' allegations (other than those specifically in conflict with the article itself) are assumed to be true, they fail to show that defendant acted with "malice." The danger that suits based on such flimsy allegations of malice would pose to freedom of speech and of the press if allowed to proceed is only too clear. As Judge Skelly Wright has observed, the cost of defending even truthful publications is so great that "[u]nless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors." *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir.1966).

IT IS HEREBY ORDERED THAT Defendant's Motion to Dismiss is granted without leave to amend.